RICHARD H. WRIGHT, Appellant, _v._ JAMES B. DUKE and Others, Respondents.

_Partnership — fiduciary relation of partners to each other — a sale by one to his co-partner in ignorance of a secret verbal agreement — action for deceit — right to damages._

The gravamen of an action for deceit is that the plaintiff has been deceived to his hurt, and not that the defendant has gained an advantage.

The relation of partners to each other is one of trust and confidence, and if some of the partners propose to buy the share of another partner in the business, the intending purchasers having general charge of the operations of the firm, of its office and of its books, they owe their fellow the duty of fully disclos-

FIRST DEPARTMENT, DECEMBER TERM, 1895.,                    [Vol. 91.

ing the extent and condition of the business and the existence of all valuable assets.

Upon the trial of an action brought to recover damages for deceit alleged to have been practised by the defendants upon the plaintiff at the time of and in connection with a sale made by him to them, his co-partners, of his interest in the assets and business of the firm of W. Duke, Sons & Co., manufacturers of tobacco and cigarettes, it appeared that at the time of such purchase the term of the partnership had expired, although the business was carried on as it had been during such term; that during the interval the defendants were negotiating for and had secured a very valuable written contract with a company whose machines they used in manufacturing cigarettes, by which the existing rate of royalty was reduced, connected with which reduction was a verbal agreement upon the part of the owners of the machines that the continuing partners should enjoy a rate for the use of machines, which should be twenty-five per cent lower than that given to any other person or firm, and that they concealed from their associate (although he knew of the negotiations therefor) knowledge of the fact of the execution of this written contract as well as of the verbal agreement, the latter agreement being inserted in the written contract after the plaintiff's retirement from the firm.

*Held,* that there was such a failure to disclose fully the condition of the business as entitled the plaintiff to recover.

It was claimed by the defendants that the contract was of no value to the plaintiff at the time of the sale by him of his interest in the business, and could not have been used in any way to his advantage, for the reasons, as claimed, that the partnership had expired by limitation before the sale of his interest; that the contract could not have been sold, or transferred or realized upon, as an asset of the firm, and that it could not have been used separately by any of the individuals theretofore composing the firm, and finally that, if assignable, it was, as a matter of fact, a contract of no value at that time.

It appeared that the contract was, as a matter of fact, treated as assignable by both the parties, and its benefits were enjoyed, not only by the firm of W. Duke, Sons & Co. after plaintiff's retirement, but also by the corporation of that name after the firm had been incorporated.

*Held,* that it was immaterial whether, as an abstract question of law, such a contract could be the subject of assignment;

That as there was evidence tending to show that the parties at the time of the sale regarded the contract as of some value, an appellate court would not investigate or determine the value, as that question concerned only the amount of the damages and not the right to them.

APPEAL by the plaintiff, Richard H. Wright, from a judgment of the Supreme Court in favor of the defendants dismissing the complaint upon the merits, entered in the office of the clerk of the county of New York on the 3d day of January, 1894, upon the decision of the court rendered after a trial at the New York Circuit before the court without a jury.

*Edward B. Hill* and *William J. Curtis*, for the appellant.

*Joseph H. Choate*, *W. W. Fuller* and *Ralph Oakley*, for the respondents.

O'BRIEN, J.:

This is an action to recover damages for deceit alleged to have been practiced by the defendants on the plaintiff at the time of and in connection with a sale made by him to them, his co-partners, of his interest in the assets and business of the firm of W. Duke, Sons & Co., manufacturers of tobacco and cigarettes. The sale was made on September 16, 1885, for the "lump sum" of $39,750, the plaintiff giving a deed of conveyance of such interest, as well as a release under seal of all claims and demands against his co-partners.

The office and principal factory of the firm was at Durham, N. C. James B. Duke had general oversight of the operations of the firm; George Watts had charge of the office at Durham and acted as cashier, secretary and treasurer in a general way, being assisted by B. N. Duke; B. L. Duke took no active part in the business. Plaintiff's duties were traveling, introducing the firm's goods and establishing agencies, in the course of which he traveled, at different times, over nearly all the world. He had nothing to do with the office of the company, and very little with the manufacturing. The articles of co-partnership between plaintiff and defendants had expired by limitation on January 1, 1885, and negotiations for a fuller term, with increased capital, were in progress from that time to the time of the sale, the affairs of the partnership meanwhile drifting along as if the firm was still in existence.

During this time, from February to April, 1885, negotiations were pending between James B. Duke on behalf of the firm, and a Mr. Strouse representing the Bonsack Machine Company, for a more favorable license to the firm than the one then existing respecting the use of machines for making cigarettes, the patents for which were owned by the Bonsack Company. It is undisputed that plaintiff was aware of and was consulted concerning these negotiations, and was informed by James B. Duke of the proposition made by the Bonsack Company to reduce the royalty to twenty-four cents a thousand on cigarettes made upon the machines, and that plaintiff objected, and said he thought better terms ought to be obtained.

The conditions of the contract being determined upon in New York, between James B. Duke and Mr. Strouse, were communicated by the former in a general way by letter to Benjamin N. Duke, at Durham, who went to Lynchburg, Va., on June eleventh, for the purpose of meeting Mr. Strouse and executing the contract. Accordingly, on that date a writing was drawn up by Mr. Strouse, purporting to contain all the provisions of the agreement arrived at between him and James B. Duke, and was signed by Mr. Strouse and B. N. Duke on behalf of their respective companies; it was then taken to the office of the firm at Durham and put in the safe. The rate therein stated was twenty-four cents a thousand.

After the terms of this agreement had been arrived at between J. B. Duke and Mr. Strouse exceedingly strained relations arose between plaintiff and his co-partners, which were accentuated by an attempt to adjust a personal debt owing by plaintiff to W. Duke, the father of the defendants Duke. The outcome was a suit by plaintiff to dissolve the firm and for a receiver, and a notice sent by the other members of the firm to the plaintiff and to all their customers on July 2, 1885, that the firm was dissolved. Plaintiff's interest was transferred on September sixteenth, after which he had no connection with the firm. During none of the negotiations leading up to the purchase by defendants of plaintiff's interest in the firm was this contract with the Bonsack Company mentioned or referred to between them, and it was upon the alleged concealment of its existence that he bases his right to recover.

The plaintiff admitted that in or about February, 1885, J. B. Duke told him that he was trying hard to get from Strouse a more favorable agreement than any other firm for the use of the Bonsack machines, and that the latter had made a proposition to reduce the royalty to twenty-four cents a thousand. But it is evident from the proofs that plaintiff was unaware of the execution of a contract such as was entered into. He himself so testifies; B. L. Duke says he did not know of its existence; B. N. Duke says he told no one of its execution except perhaps his partner Watts; Watts testified that he certainly believed that plaintiff knew nothing about it because the written article had been in his possession since its execution, and that plaintiff never had asked for it, nor had it been shown to any one; and J. B. Duke does not say that he told plain-

tiff of its execution, but simply that some months prior to the con-
tract being signed he informed plaintiff of the terms being agreed
upon for which the contract afterwards provided. But even had
the plaintiff, prior to the transfer of his interest in the firm, read or
been told the contents of the written memorandum or agreement, he
would not thereby have become aware of the vital feature of the
contract between his firm and the Bonsack Company, which pro-
vided that the firm should always have twenty-five per cent lower
rate than anybody else; because, though it had been agreed upon
between J. B. Duke and Mr. Strouse before the contract was signed,
it was not reduced to writing until January, 1886, when this hitherto
unexpressed condition was written in at the instance of J. B. Duke.

The learned judge below has found as a fact, " That the plaintiff
was informed by James B. Duke, at the time of negotiating the
said oral contract, as to what terms Mr. Strouse, the president of
the Bonsack Machine Company, was willing to have provided in
said contract." Upon the question whether or not this finding is
correct, the whole case turns. If the plaintiff, though ignorant of
the execution of the contract, was informed at the time of its
negotiation, as claimed by J. B. Duke, of all the terms and condi-
tions that were to be embraced therein, he could not hope to estab-
lish his cause of action, because, with the knowledge that such an
important arrangement was in progress, it would be as much his
duty as that of the defendants, while discussing the subject of the
sale to them of his interest in the firm, to call attention to it as being
of value in determining the amount he should receive, and plain-
tiff's claim of a fraudulent and intentional concealment would be
unavailing, and the judgment should be affirmed. If to our minds
an examination of the record shows that such finding was unwar-
ranted, compelling the inference that, while plaintiff was informed
of some of the terms of the agreement, he was kept in ignorance of
its most important condition, and that this was done designedly,
then the conclusion follows that such concealment was a fraud upon
the plaintiff, requiring that the judgment dismissing the complaint
upon the merits should be reversed.

Upon this point we have on one side the unsupported statement
of J. B. Duke that he told plaintiff at the time of his having agreed
with Mr. Strouse for the twenty-five per cent preference to his

FIRST DEPARTMENT, DECEMBER TERM, 1895. [Vol. 91.

firm. On the other side we have, besides the denial of the plaintiff, the whole course of circumstances and events prior and subsequent to the sale, as tending to discredit the accuracy of Mr. Duke's recollection in this respect.

The plaintiff had regarded the use of the machines favorably, and was anxious to have them adopted by the firm. The reduced royalty proposed or agreed to be paid for their use, however, he did not regard as advantageous. If that had been all there was of the contract, and he had known it during the negotiations to buy out his interest in the firm, it undoubtedly would have had no influence upon him in fixing the value of his share at any higher figure than he was induced to accept. He stated at the time the rate was named to him that he thought better terms could be secured, expressing himself in vigorous language. That this statement was well founded, as well as the fact that had he known of the provision of the contract giving his firm a preference of twenty-five per cent over other users of the machines, he would have regarded it as of great value, is shown by the events after the severing of his connection with the firm. In a short time it was seen that plaintiff's advocacy of the Bonsack machines was justified. Their use revolutionized the business of making cigarettes, and the profits of the defendants sprang up enormously, and increased from year to year. Soon after the sale, and on September 30, 1885, plaintiff became general manager of the Lone Jack Cigarette Company. As a condition of his joining such company he insisted upon a contract with the Bonsack Machine Company, and he obtained one at the rate of fifteen cents a thousand. After learning of the Lone Jack contract, defendants claimed a rate of eleven and a quarter cents and a balance due them for excessive royalties paid of upwards of $237,000, which they sought to enforce by litigation. The result, therefore, of plaintiff's efforts to get a low rate for his new company was to obtain still more favorable terms for his competitors, his late partners, who by reason of their contract were beyond competition. These circumstances decidedly weaken the force of J. B. Duke's testimony that he told plaintiff all the terms of his oral agreement with Mr. Strouse, for it is difficult to believe that plaintiff would have undertaken so hopeless an enterprise as the building up of competition in the manufacture of machine-made cigarettes, as

against the defendants, had he known they possessed such advantages.

That the defendants were as oblivious of the value of the contract as they try to have it appear is also incredible. On September 5, 1885, the defendants made a proposition to plaintiff either to purchase his one-fifth interest in the firm for $36,000, they to take the assets as inventoried July second, as if they had purchased the same on that day, or to sell their four-fifths interest at $36,000 a share, the plaintiff to take the assets as shown by the books and inventory of that date. The latter proposition did not include the good will of the business nor the use of the firm name. Nor does it appear that they intended it to include the contract with the Bonsack Company, for on September seventh they wrote by Mr. Watts to Mr. Strouse informing him that they were having trouble with the plaintiff, and that there was a possibility of the business being sold by order of the court, and of plaintiff through a syndicate becoming the purchaser. The remainder of the letter is as follows: "Should such an event take place we would at once begin manufacturing cigarettes under the name of W. Duke, Sons & Co., with as much capital as we now have and all the experience; so would. give the new buyers a lively time, as we feel confident that within twelve months any new cigarette business we might start would be as large as this one now is. We desire to know that should we conclude not to purchase the present brands and business, but start a new one, will you give us the use of the machines now in use here? If we get these machines soon as we should want them, and under same arrangements as now (of which Mr. Wright knows nothing), we would endeavor not to employ any hands to roll cigarettes. Advise us at once, as we are making all necessary arrangements looking to the possibility of such an event." This certainly looks as though the defendants fully appreciated the value of the machines in the manufacture of cigarettes, and that the experimental stage in their use was past, else why should they say, "we would endeavor not to employ any hands to roll cigarettes;" i. e., rely wholly on the machines for production. And with such faith in, and reliance upon, the machines, if they could have them under the same arrangements as then existed, whether known or unknown to plaintiff, they might well feel justified in saying they

" would give the new buyers a lively time, as we feel confident that within twelve months any new cigarette business we might start would be as large as this one now is."

In addition, we have the evidence of J. B. Duke on the trial of an action brought by the Bonsack Machine Company against W. Duke, Sons & Co. after the dissolution of the firm, in which he stated that he had not told Mr. Wright about the contract. And it appears from the correspondence of the defendants with that company that, in order to avoid knowledge of the terms of the contract by persons who might open the mail of W. Duke, Sons & Co., the royalties were returned on the basis of the original contract, and rebate checks sent by the Bonsack Company to correspond with the reduced rate of twenty-four cents per thousand. Upon the same trial the defendant B. N. Duke testified that he never told plaintiff nor anybody but defendant Watts about the contract. We have, besides, the inventory which was shown plaintiff during the final closing of the transaction, in which the cost of the machine-made cigarettes was put down at figures which were not correct, such cost being put down by the appraisers who made the inventory from information furnished by the defendant Watts, who gave no explanation of why correct prices were not put down.

It is true that the defendants offered and allowed the plaintiff every opportunity to examine the books; but, in view of the manner in which the rebates were made, not even an expert looking at the books could have told that the firm paid less than the standard rates of royalties. And an examination of this inventory and the books which plaintiff made, and which purported to show a payment of standard royalties of thirty and thirty-three cents a thousand, may account for the failure of plaintiff to inquire further, believing as he might have done that the books and inventory correctly set forth the true relations of his firm with the Bonsack Company. Apart from this, however, it is evident that no examination that he could have made, not even an inspection of the written agreement, which was carefully put away in the safe by defendant Watts and never shown to the plaintiff, would have given him a knowledge of all the terms of the agreement, particularly of the crucial one which related to the twenty-five per cent preference clause which, as stated, was not put in writing until the January following the retirement of plaintiff from the firm.

Another reason why the plaintiff could have assumed that the contract was not concluded was, that when J. B. Duke informed him of the terms that Strouse was willing to accept, plaintiff told him to hold off and he would get more favorable terms. Unless, therefore, there is evidence to show that subsequent to that time plaintiff was informed that a contract had actually been entered into between the parties, and he was apprised of its terms, he might very well have thought that they were still engaged in negotiating a contract; and this view is strengthened by the fact that immediately upon retiring from the firm the plaintiff sought to obtain for the Lone Jack Company, with which he then became connected, from the Bonsack Company, more favorable terms than those fixed by the original agreement, which appeared by the inventory and books shown to plaintiff as being the royalties that the firm of W. Duke, Sons & Co. was then paying.

Regard being had, therefore, to the studied efforts to conceal from the plaintiff all knowledge of the real agreement between the firm and the Bonsack Company, we must conclude, notwithstanding the testimony of Mr. J. B. Duke on this trial to the contrary, that at the time when plaintiff sold his interest in the firm he was ignorant of that feature of the contract which favored Duke, Sons & Co. over all other firms or competitors.

Were this sale of plaintiff's interest a negotiation between strangers, it may be that no obligation would rest upon the defendants to state fully and in good faith all the terms of the agreement; but this rule cannot prevail as between partners. In *Mitchell* v. *Reed* (61 N. Y. 126) EARL, Ch. J., says : " The relation of partners with each other is one of trust and confidence. Each is the general agent of the firm, and is bound to act in entire good faith to the other. The functions, rights and duties of partners in a great measure comprehend those both of trustees and agents, and the general rules of law applicable to such characters are applicable to them." In Parsons on Partnership, *225, it is said : " From the requirement of perfectly good faith it follows that no partner must deceive his co-partners for his benefit, and their injury, either by false representations or by concealments. * * * So if he proposes to buy of them the whole or any part of their share of the business, and by any false statement or intimation on his part, or any conceal-

ment or prevarication, influences them to enter into an arrangement to effect his wishes, it will not be obligatory on them." And in 1 Bigelow on Fraud (ed. 1890), 311, 312, it is said : " Where a partner intending to purchase the interest of his co-partner has had the special management of the business or the keeping of the accounts * * * the intending purchaser must make a full disclosure of the extent and situation of the business ; otherwise the purchase will be liable to be avoided by the other partner." And in the same work (pp. 312, 313) it is said : " It is certainly the duty of partners towards each other to refrain from all concealment in the transaction of the partnership business. If a partner be guilty of any such concealment and derive a benefit therefrom, he will be treated in equity as a trustee for the firm, and compelled to account to his co-partners. * * * The burden is upon him to justify the transaction." There would be no advantage in multiplying authorities upon this subject, all tending to support the proposition that in their dealings, as between each other, partners must act with the utmost candor and good faith. This duty or obligation was not lessened in the case at bar by the fact that during the negotiations the relations between the partners became strained, for until the relation was terminated the obligation remained.

Since, therefore, the knowledge that the firm possessed a favorable contract was exclusively in the possession of the defendants, which did not appear in any writing or book kept by the firm, and could not in all its terms be ascertained from the written agreement, it is useless to argue " that plaintiff was given a full opportunity to investigate the firm's affairs," and, against his right to complain, to insist that " by his own admissions it appears that he was invited to be present at the taking of the inventory ; that he did not come ; that he knew there were many contracts of the firm, none of which were included in the inventory ; because had he done what the defendants claim he should have done with respect to attending and examining, he could not have obtained, except from an admission of such of the defendants as knew, any knowledge of the existence of an agreement which gave the firm the preference they then had over all competitors, which if the result of the use of the machines could have been foreseen, was a most valuable asset. This, we think, is an answer to the suggestion made by the learned

trial judge, that the plaintiff is not entitled to succeed because he might have ascertained the existence of the Bonsack contract by inquiry. For, in view of the attitude and conduct of the defendants, there is a grave doubt whether any inquiry by plaintiff would have elicited the information; and there is no proof that we have been able to find that the plaintiff had reason to suppose that any such contract, including the preference clause, existed, everything being done to induce him to believe just the contrary.

The crucial point is, that the most valuable part of the contract was verbal, and it was not known by or communicated to plaintiff, and seems to have been purposely concealed. The concealment of so much as was in writing is not, therefore, very material, except as bearing on the question as to whether or not knowledge of the existence of the contract was designedly withheld from plaintiff. It is begging the real question then to argue that plaintiff could have ascertained by inquiry the existence of the written portion, and upon demand could have seen it, or could have ascertained its conditions from the firm's books. And in connection with the testimony showing that plaintiff's expert was given full opportunity to examine the books, we must remember the testimony of Watts, that "no expert looking at our books could have told that we paid a royalty to the Bonsack Company of less than thirty and thirty-three cents respectively."

It is contended, however, that, assuming that plaintiff sold his interest in the business in ignorance of the existence of this license, as he claims, he suffered no damage and can recover none. This proposition is claimed to be supported by the well-settled rule that the gravamen of an action for deceit is that the plaintiff has been deceived to his hurt, and not that the defendant has gained an advantage. It may be that the measure of damages as to the value of the contract is its value on the 16th day of September, 1885; and it is claimed that the license was then of no value to the plaintiff, and could not have been used in any way to his advantage whatsoever, for the reasons, as claimed, that the partnership had expired by limitation; that the license could not have been sold, or transferred, or realized upon, as an asset of the firm; that it could not have been used separably by any of the individuals theretofore composing the firm, and, finally, for the reason that, if assignable, it was, as a matter of fact, a contract of no value at that time.

This last reason we shall consider hereafter. With regard to the others alleged, they are based on what actually did occur, and not what might have been the result had plaintiff known of the true state of facts. After the notice of July second, and when plaintiff had filed his bill for a dissolution, it could not be known what the ultimate mode of dissolution would be. It might be that the defendants would, as they actually did, buy out the plaintiff; it might be that the plaintiff would buy out the defendants; it might be that the assets of the firm would be sold under judicial decree in plaintiff's suit. Whether the purchaser would secure the benefits of the contract, we do not regard as important. There is apparent authority for the proposition, both in the Federal and State courts, that the validity of such a contract is not affected by a change in the firm. (*Belding* v. *Turner,* 8 Blatchf. 321; *Sizer* v. *Ray,* 87 N. Y. 220.) But apart from this, it was, as a matter of fact, treated as assignable by both the parties, and its benefits were enjoyed, not only by the firm of W. Duke, Sons & Co. after plaintiff's retirement, but also by the corporation of that name after the firm had been incorporated. We think, therefore, the appellant correctly argues that it is a matter of little consequence whether, as an abstract question of law, the defendants might or might not have been deprived of the contract, if in fact they have enjoyed the benefits of it. And it is evident from Watts' letter already referred to that the defendants believed that the rights of the Bonsack contract would pass to the purchaser of their establishment, and they were taking the precaution of opening negotiations for a new contract with that company.

This brings us to a consideration of the contention that, even if the contract was assignable, the plaintiff was not injured because as a matter of fact the contract at the date of the sale had no value. If this question is to be determined by the evidence, there is sufficient to show not only that the plaintiff would have regarded such a contract as of some value, but the efforts of the defendants in preventing his knowledge of its existence and taking measures to secure a contract equally favorable in the event of his purchasing their interest have a tendency to show that they also regarded it as of some value. Whether the value was more or less is beside the question presented for our consideration and would be wandering into the regions of speculation. Its only bearing could be upon the

question of damages and would go to the amount thereof. Of course, if it clearly appeared that the contract was of no value, this court would not put the parties to the expense and labor of a new trial merely for the purpose of determining a technical right. But as we have said, there being evidence to show that even as of the date of the sale it had some value, it is unnecessary for us to determine how much, because that concerns the amount of damages, and not the right to damages, which latter is the question we have to decide.

Our conclusions upon this record, therefore, are, that if the finding of fact made by the learned judge below, to the effect that the plaintiff was informed as to what terms Mr. Strouse was willing to have provided in said contract, is intended to cover plaintiff's knowledge of the existence of the preference clause of twenty-five per cent, then we think that such finding is unsupported by evidence, and that, on the contrary, the evidence preponderates in favor of a finding that the plaintiff was ignorant of any such clause; that its existence was deliberately concealed from him to his injury; and that, in view of the relation of the parties, the concealment of such fact was a fraud on the plaintiff for which he is entitled to damages.

The judgment, therefore, should be reversed and a new trial ordered, with costs to appellant to abide the event.

VAN BRUNT, P. J., and PARKER, J., concurred.

Judgment reversed, new trial ordered, with costs to appellant to abide event.