American Central Ins. Co. *v.* Landau.

---

The American Central Insurance Company et al.          62   73|
                                                       65  570|

*v.*

Gerhardt W. I. Landau.

[Submitted February 1st, 1901.   Decided July 1st, 1901.
Filed September 3d, 1901.]

1. One of the provisions of a fire policy was that in case of a disagreement between the parties as to the amount of loss the same should be ascertained by two competent and disinterested appraisers, one to be chosen by each party, and the two to select an umpire, with further provision as to the mode of procedure by the appraisers and umpire and the rule of damages. After a fire, and disagreement as to the amount of damages, the parties entered into a written agreement, strictly in accordance with the terms of the policy, each appointing an appraiser. The two appraisers met and were sworn, appointed an umpire, and proceeded to the appraisement, and disagreed as to the damages, after which one appraiser refused to proceed with the appraisal and resigned. The other appraiser called in the umpire, and the two made an award.—*Held*, (1) that the resignation and refusal to proceed of the one appraiser did not revoke or put an end to the agreement of appraisal; (2) that in the case stated the party whose appraiser resigned and refused to proceed could not thereafter revoke such submission; (3) that if the party whose appraiser refused to act desired to have an appraiser present at the examination and conference between the other appraiser and the umpire, it was his duty to have appointed a new appraiser and ask that such new appraiser be permitted to take part in the proceedings.

2. The insured asserted at the hearing that the appraiser appointed by him did not honestly try to agree, but acted a part and insincerely demanded an appraisement for damages far beyond what he believed to be the real damage, and thereby led to a disagreement which was apparent only.—*Held*, that the motive of the appraiser in so doing could not be inquired into by the party appointing him, nor could that party, in equity, set up that the apparent disagreement was not an actual honest disagreement, and that for that reason it did not give jurisdiction to the umpire to come in an act with the other appraiser in making an award.

3. If a party to an arbitration agreement has good grounds to revoke the submission, he must exercise his right to revoke promptly. He cannot experiment and wait to ascertain whether the award is favorable or not to him, and, if it prove to be unfavorable, then assert his right to revoke.

4. The articles injured by fire were numerous, and situate in several different apartments. The two appraisers examined the greater part in number and value of the articles and disagreed as to the damage, and on

American Central lns. Co. v. Landau.

grounds which would prevent their agreeing as to the damage to the remaining articles.—*Held*, that in order to give jurisdiction to the umpire to take part in the appraisement it was not necessary that the appraisers should disagree as to the damages to each and every article injured.

5. That under the circumstances of the case the award made by the one appraiser and the umpire, in the absence of the other appraiser, was binding.

6. The case is distinguishable from that of *Broadway Insurance Co*. v. *Doying, 36 Vr. 69*, in that in the latter case the arbitration agreement was not in accordance with the terms of the policy.

7. The defendant was insured in several policies held by different companies, some of which insured all the machinery for a gross sum, and others insured each specific item for a fixed sum upon that item. The number of separate pieces of machinery injured or destroyed by the fire was great, and evidence as to the damage to each was technical and voluminous.—*Held*, that separate actions at law against each of the insurers should be restrained, for two reasons—*first*, that it would be impracticable for a jury to properly apportion the loss among the several policies; and *second*, that the evidence concerning the items of property injured or destroyed was so voluminous, and the items of property so numerous, that it would be impracticable for a jury to consider and apply it; and that the case was within the doctrine laid down in *Cranford* v. *Watters, 16 Dick. Ch. Rep. 284*.

8. By the terms of the policy the damages were confined to direct loss or damage by fire to the property, and to the amount necessary to repair or replace the same. The subject of the insurance was a plant of machinery for throwing silk, in actual use. The greater part of the machinery, in bulk and value, was not touched by fire, but was injured solely by smoke and water, but the building which covered it was rendered untenantable by the fire, and the further use of the machinery as a throwing plant in that building was rendered impracticable.—*Held*, that in ascertaining the damages the appraisers were confined to the direct injury to the machinery itself and the cost of repairing and replacing it, and could not take into consideration the fact that the result of the fire to the building was to stop the business and destroy the value of the plant as a going concern.

———

Final hearing on bill, combined answer and cross-bill and replication and answer thereto.

The object of this suit, on complainant's part, is to enforce a finding in the nature of an award by appraisers ascertaining the damage by fire to certain machinery, the property of the defendant. A statement of the bill, so far as it is necessary at present to be set forth, will be found in *11 Dick. Ch. Rep.*

*513, 39 Atl. Rep. 400* and *21 N. J. L. J. 113,* where it was
brought before the court on a demurrer by the defendant.

The original bill was filed April 22d, 1896, and an order to
show cause was made why an injunction should not issue, with
interim restraint. No proceedings seem to have been had under
that order, and it appears to have been acquiesced in by the
defendant. Subsequently, on July 31st, 1896, the complainants
filed an amended bill, to which the defendant filed a demurrer on
December 24th, 1896, which was overruled by an order made
in April, 1899. The defendant, on April 12th, 1899, filed a
combined answer and cross-bill, and the complainants filed an
answer and replication thereto. The defendant joined issue on
these and the cause was brought to hearing on proofs which
occupied fourteen days in their production.

The answer admits all the material allegations of the bill,
with a few exceptions, which may be stated as follows: It denies
that part of the allegations and conclusions of the bill which sets
forth what has been called an overlapping among the policies,
and which was so treated in the previous opinion; it denies that
there is any difficulty in adjusting the proportion of loss of each
of the complainants in an action at law against each of them
separately. It also denies the other complications and difficul-
ties set forth in the bill as a reason why the cause should not
be submitted to a jury.

With regard to the ascertainment of damages by the ap-
praisers, the answer admits that Frank Atherton, one of the
appraisers, was nominated by the defendant and that Edward
S. Winchester, the other appraiser, was nominated by the com-
plainants; but it denies that Winchester was a competent or
disinterested appraiser, and alleges that the defendant was
induced to sign the appraisal agreement through false represen-
tations as to the competency and disinterested character of
Winchester. It admits the selection by the appraisers of Man-
ning as the umpire, but denies that Manning was a competent
and disinterested umpire, and avers that Atherton, the de-
fendant's appraiser, was induced to acquiesce in the selection of
Manning by false representations made to him by Winchester
as to the competency and disinterestedness of Manning, and

it denies that the appraisers ever entered upon their duties, or that in the course of such appraisement they subsequently agreed or disagreed as to the sound value and damage of each and every item of the property insured, or as to any item of such property. It denies that their differences were submitted to Manning, the umpire, and that Manning determined the differences; and denies that the loss under the policies was ever estimated or appraised, and, while admitting that Winchester and Manning signed the award, it avers that the award was invalid and of no effect; alleges the fact to be that the agreement of appraisal was never more than an executory contract; that Atherton, the defendant's appraiser, became satisfied when he commenced his work with Winchester that Winchester was not a trustworthy or competent man; that Atherton was a trustworthy and competent man, and that he satisfied himself before the work of appraisal had made any substantial progress that Winchester did not know anything with regard to the class of property destroyed by the fire and was entirely incompetent to appraise the loss, and was prejudiced in favor of the insurance companies, and that Manning was equally incompetent and prejudiced; "that Atherton then declared to this defendant that he would not go on with the appraisement in company with the said Winchester; that immediately thereafter the said Frank Atherton wrote a letter to this defendant withdrawing from his position as such appraiser; that thereupon this defendant was entirely unrepresented in the appraisement; that this defendant thereupon endeavored to get the said Atherton to continue his work as such appraiser, but he refused to do so; that this defendant thereupon objected to the appraiser appointed by the insurance companies and the umpire continuing the work of appraisement, and withdrew from the agreement to submit to appraisement," and informed Winchester and Manning that he had so withdrawn and that he would not be bound by anything further done by the said Winchester and Manning, and that he wished the proceedings to cease till such time as he could be represented in the appraisement; and that all this was done before any substantial progress was made with the appraisement, and defendant thereby withdrew his consent to have the

appraisement continued, and by the voluntary withdrawal of Atherton from the position of appraiser the defendant was deprived of the weight of Atherton's influence on Winchester and also upon Manning; and alleges that the supposed appraisement was an arbitrary act on the part of Winchester and Manning and beyond the scope of the submission or agreement to appraise; and he sets up that he has always been willing to have a proper appraisement made of the loss under the provisions of the respective policies of insurance, and has at various times offered to the complainants to proceed under the appraisal clause contained in the policies, but the complainants refused to undertake said appraisement as provided for by the terms of the policies; and he submits that any action taken by one appraiser and the umpire after defendant's appraiser had refused longer to act, while the defendant was unrepresented in such appraisement, and after the defendant had given notice of the existing state of affairs to the complainants, should not bind the defendant or prejudice his rights; and alleges, as a matter of fact, that neither Winchester nor Manning were competent or trustworthy men, and offers to prove it.

The cross-bill prays that, for the reasons set forth in the answer just recited, and also for the further reason charged in the cross-bill that the appraisal made by Winchester and Manning was grossly inadequate, and, in connection with their incompetency and lack of impartiality, showed fraud on their part in making the appraisal, the agreement for appraisal may be rescinded and declared null and void, both at law and in equity, and of no binding force whatever, and that the same be delivered up to be canceled, and the complainants enjoined from using it in defence to the action.

The cross-bill further prays that in case the court, notwithstanding the answer of the defendant, shall grant the prayer of the complainants and enjoin and restrain the defendant from prosecuting his actions at law, then in such case, by way of alternative relief against the complainants and each of them, the court will take cognizance in this suit of his various claims referred to in the bill of complaint against the complainants and each of them, and adjust in this suit the various rights of

action of this defendant against the complainants in granting him relief by way of a decree directing payment by the complainants, and each of them, of the damages, &c.

The answer sets forth the amount received by the defendant in settlement with two of the insurance companies who underwrote upon the same property and suffered a loss by the same fire.

The award was as follows: sound value, $14,205.01; damage, $5,936.90.

*Mr. Edward M. Colie,* for the complainants.

*Mr. Eugene Stevenson* and *Mr. John B. Humphreys,* for the defendant.

PITNEY, V. C.

The pleadings and proofs raise two questions—*first,* was the ascertainment of damages (called the award) valid and binding on the defendant? And *second,* whether found to be valid and binding or not, has the case made by the bill as to the difficulties of proceeding at law been so far supported by the proofs that the defendant ought not to proceed with his actions at law? If the court is against the defendant on both points, then a permanent injunction against the suits at law must issue, upon condition that the complainants pay the award. If the court is against the complainants on the first question, but with the complainants on the second question, then it will be the duty of the court to proceed to ascertain the damages.

Now, first, as to the validity of the award. That is attacked on several grounds—*first,* that Winchester, the appraiser nominated by the insurance companies, was an incompetent person and unduly prejudiced in favor of the insurers; *second,* that Atherton, the appraiser nominated by the defendant, was induced by Winchester to agree to the appointment of Manning upon false representations made to him by Winchester, and that Manning was an incompetent and partial umpire; *third,* that the defendant revoked the agreement to submit to those parties before the award was made and gave them notice that he would

not be bound by it; *fourth,* that Atherton refused, against the wishes of the defendant, to proceed with the appraisement, and wrote a letter to the defendant resigning, and himself notified the other appraiser that he would not proceed; and that there never was any real attempt at an agreement between Atherton and Winchester, the two appraisers, and hence the umpire had no jurisdiction to intervene, and the whole proceeding of appraisal between Winchester and Manning was without jurisdiction.

As to some of the allegations upon which these points were based no attempt was made to support them by evidence, and as to others a very faint attempt was made. There was no proof of any false representations made to Atherton, or of any direct revocation by the defendant of the submission and authority to the appraisers and umpire to proceed with their work. The reliance of the defendant upon this part of the case is upon deductions to be drawn from the actual conduct of the appraisers and umpire and conversations between them and himself.

This brings us to a discussion of the evidence bearing on this part of the case, and in order to understand it, it is necessary to know the general situation and features of the loss.

The fire occurred May 7th, 1895. The defendant was the owner of a factory plant for throwing silk, on the corner of Straight and Ellison streets in Paterson. It consisted, first, of a main building (No. 1) of brick, two stories high, seventy feet on Straight street and eighty feet on Ellison street. The whole of the first floor was in one room, the floor above being supported by iron columns. In the rear of this, along Ellison street, was an engine-room and silk soaking-room (No. 2); in the rear of this was a one-story frame boiler-house and a storage-room (No. 3). Adjoining the storage-room, coming from Ellison street, was a stable (No. 4), and next, beyond that, in the same direction, a long narrow two-story frame building (No. 5), and known as the two-story frame mill. In front of that, towards Ellison street, and a few feet away from the main brick building, was a one-story frame building (No. 6). Immediately adjoining the main brick building, on Straight street, was a small wooden building used for an office and silk vault.

The insured property involved in the present suit consisted of a great variety of articles, those comprising the principal value being machinery for silk throwing—by which is meant twisting—the most valuable of which were situate on the first floor of the main brick building (No. 1). On the second floor of this building was a weaving silk plant owned by one Dery, who was a tenant of the defendant, and upon which plant the defendant held a chattel mortgage. A small portion of the premises was occupied by another small silk manufacturing plant owned by Messrs. Fogel, Killin, Kane & Wilkinson. The complainants, in addition to the policies of insurance which gave rise to the present suit, were liable on policies on Dery's silk plant, which policies were assigned to Landau as collateral security for his mortgage, and also upon the building itself, which also belonged to him, and upon his engine and boiler furnishing power for both plants.

The fire, which broke out in the middle of the day after all the mill hands had been given a half-holiday to attend a circus, destroyed, in part, the upper part of the main building and some of the wooden buildings in the rear, and was quite destructive of the frame mill (No. 5), but did not reach to or injure any of the machinery on the first floor in the main building, which, as before stated, comprised a majority in value of the risk. The injury to the defendant's machinery on the first floor of the main building was due entirely to smoke and water thrown by the engines, which came down through the floor from the upper story.

The policies of insurance are of the standard form required by our legislation, and required certain preliminaries on the part of the insured in order to entitle him to demand compensation.

One preliminary was that he was to submit to examination under oath and produce books of account, vouchers and bills. Another:

"If fire occur, the insured shall give immediate notice of any loss thereby in writing to this company; protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article and the amount claimed

thereon; and, within sixty days after the fire, unless such time is extended in writing by this company, shall render a statement to this company signed and sworn to by said insured, stating the knowledge and belief of the insured as to the time and origin of the fire, the interest of the insured and of all others in the property, the cash value of each item thereof, and the amount of loss thereon."

This paper is called a proof of loss.

Within the sixty days Landau presented to the several companies his proofs of loss. They were elaborate, and had been prepared by the aid of a skilled insurance adjuster.

The claims for loss on the building and the machinery in the Dery plant, also on the engine and boiler which furnished power for both plants, were adjusted without litigation.

The claim on the machinery and other items belonging to the defendant and covered by the complainants' policies was, in round numbers, as follows:

|  | Sound Value. | Loss. |
|---|---|---|
| Machinery in brick building | $17,109 00 | $11,673 66 |
| Two-story frame mill building | 3,837 88 | 3,495 00 |
| Addition to frame building | 1,054 10 | 929 00 |
| Making a total of | $22,000 98 | $16,097 66 |

This claim was disputed by the insurance companies, and they called on Landau to produce, for examination, his books of account, bills, invoices and other vouchers, and also compelled him to submit to an examination under oath. The result was a disagreement. (This remedy was also used in the adjustment of the other losses.)

The policies had this further clause:

"In the event of disagreement as to the amount of loss, the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; the parties thereto shall pay the appraiser respectively selected by them and shall bear equally the expenses of the appraisal and umpire."

Under that clause Landau and the complainants entered into an agreement known as the appraisal agreement, in these words:

"It is hereby agreed by G. W. I. Landau, of the first part, and the Palatine Insurance Company and the several other insurance companies interested, of the second part, that Frank Atherton, Paterson, N. J., and Edward S. Winchester, they first selecting a competent and disinterested umpire, to whom they shall submit their differences in case of failure to agree, shall estimate and appraise the loss and damage by fire of May 7, 1895, to the property of G. W. I. Landau, as mentioned herein or specified in schedule attached, stating separately sound value and damage, which estimate and appraisal by them or two of them in writing hereon shall determine the amount of such loss and damage, it being understood that this agreement is of binding effect only as regards the sound value and damage of the said property, and does not in any respect waive any of the conditions of the insurance policy.

"The property on which sound value and damage is to be estimated and appraised is as follows [describing same].

"It is expressly understood and agreed that the said appraisers are to consider the age, condition and location of said property previous to said fire, and shall make a proper deduction for depreciation and difference between the value of like property replaced new and the property mentioned.

"Dated, New York, this 19th day of September, 1895.   [Signed by all the parties.]

"We, the undersigned, do solemnly swear that we are disinterested either as partners, creditors, or otherwise to any of the parties to the above agreement, and that we will return a just and true estimate and appraisement of the sound value and damage to the property of G. W. I. Landau in conformity with our appointment, and that we have chosen as umpire Charles H. Manning, Superintendent Engineer of the Amoskeag Manufacturing Co., of Manchester, New Hampshire.   [Signed and sworn to by Frank Atherton, Edward S. Winchester and Charles H. Manning.]"

Mr. Winchester was a retired manufacturer living in Boston and Mr. Manning was the superintendent of the well-known Amoskeag mill, of Manchester, New Hampshire, and a mechanical engineer of much repute.

Mr. Winchester, being apprised of his appointment, came immediately to New York, saw Messrs. Cardozo & Nathan, the counsel for the insurers, received from them two copies of the arbitration agreement, each executed by both parties, and a list of the articles damaged or destroyed. On the afternoon of October 1st he proceeded to Paterson in the performance of his duties, called upon Mr. Atherton, who was a manufacturer

of silk machinery, of Paterson, at his place of business, and found him not in. He made known his business to a gentleman employed in the office, who told him that Mr. Atherton would not be there that day or the next. Mr. Winchester mentioned the hotel at which he was stopping in New York City and said that he would wait there for a communication from Mr. Atherton notifying him when he would be ready to proceed. The party in the office stated to Mr. Winchester that Mr. Atherton did not like to go on with the loss, and wished he had had nothing to do with it. Winchester then called on Mr. Ekings, an insurance agent in business in Paterson, and introduced himself to him, who sent his son and introduced Winchester to the defendant. The defendant gave him a history of the case, showed him over his factory, told him what was his idea and also that of a Mr. Morrison, of the amount of the loss. Mr. Morrison had been in the business of manufacturing throwing machinery and was a dealer in it and had made an appraisement of the loss. Winchester replied that Landau must not expect any expression from him with regard to his loss, and that no man was fit for an appraiser who did so previous to having qualified as such. Landau acquiesced in this thought, and asked if he could show Winchester any courtesies, which the latter declined. Winchester then returned to New York City.

On the afternoon of October 3d Winchester returned to Paterson, found Atherton at his office and place of business, and Manning was agreed upon as the umpire. They—Atherton and Winchester—proceeded thence to the office of Mr. Ekings, the insurance agent, who was also a notary public, and were sworn in. They made a separate affidavit to each copy of the agreement, and before the oath was administered Manning's name was inserted in each agreement by the notary in their presence, and one of those agreements was given to Atherton and one to Winchester.

The conversation between Atherton and Winchester and their conduct while together in the performance of their duties, are of the utmost importance in considering the value of the award, and it is worth while to state here the sources and character of the evidence given on that subject. Atherton was living

within the jurisdiction of the court during the whole period of time covered by the hearing, and was present in court at some of the sessions, but was not put upon the stand as a witness. Winchester was called and sworn and gave his recollection, refreshed by a letter written by him in duplicate at or shortly after the date of the award and addressed to Mr. Landau and the agent of the insurance companies severally, and put in evidence. The findings of fact, on this part of the case, are based upon that letter and Winchester's evidence. Landau and one or two other persons were present for a short time while Atherton and Winchester were together, and their evidence as to what occurred has been taken into consideration.

In the letter of Winchester, just mentioned, he states that on his way from Atherton's office to the notary's office—when on the stand he swore that he thought it was on the way from the notary's office to Landau's mill (the precise point of time is of no consequence)—Atherton said to Winchester, "I don't like this business and don't want to have anything to do with it, and if there is any way to get out of it I will get out of it."

They proceeded to Landau's mill, saw Landau, informed him that they had been qualified to act (sworn in) and were ready to give him a hearing. Landau furnished them with a schedule of articles, numbered consecutively, comprised of several sheets. They then gave him an extended hearing; asked him to tell them whatever he had to say about his property, and he did tell them all he wished, until he said there was nothing more to be thought of; and then, at their request, he went through all the different rooms and buildings with them and chalked off the different machines, numbering them according to the schedule, in order to identify them, and found that all of the property scheduled, except such as was alleged to be entirely destroyed, was there on the ground. This preliminary over, Landau left the two gentlemen to themselves.

They started their examination in room No. 1, in the main building. This room, No. 1, contained twenty-six different machines, or "frames," as they are called, each provided with many spindles (but varying in number) and named according to the particular use to which they were applied. Nine were

what were called hard silk winders, four called doublers, five called first-time over-spinners and five second-time over-spinners. Others were called deckers, and some were larger than others in that they had more than one tier. Besides these were the shafting, hangers, pulleys and belting. Mr. Atherton at once asked Mr. Winchester if he was a mason. He replied that he was, and then Atherton said, "I want to have a confidential talk with you"—which was understood not to pass beyond themselves. Atherton said:

"I don't want to go on with this loss; this machinery is old stuff; and I do not want to lie about it; no one could afford to use it. Mr. Landau wants so much more than it is worth, so much more than what the damage is, that I don't want anything to do with it. These spindles—these are poor machines. Our machines that we now make run twelve thousand revolutions a minute; these spindles won't run half that; besides, our winding frame is only eighteen inches wide, and this frame is thirty-six inches wide [occupies so much floor space]."

Winchester then asked Atherton, "What do you consider the damage to these frames?" (that is, the damage by water, they had not been burned). He replied, "A week's work to a frame [machine] for one man." Asked what that was worth, he said, "$15 or $20." "Well," Winchester said, "Which will you have it?" and Atherton said, "Call it $20 for these frames here [naming all the frames of that kind] and call it $25 a frame for the three-deckers"—and figures were put down by each in a memorandum book. As they moved along by the ends of the machines Atherton said:

"Let's not do any more about this to-day. You had better telegraph to Mr. Manning to come on and let him settle it. I want to talk with my father about this thing."

Winchester coincided with him and said that he (Atherton) was in a hard place and perhaps he had better talk with his father about it. They then went out of the mill, walked to the railroad station, and on the way Atherton said:

"I am going to disagree with you on this entire amount of machinery; I want you to send for Mr. Manning, and you and Mr. Manning must settle it."

Winchester replied, "Is that your decision?" to which Atherton answered, "That is my decision, and I want you to telegraph Mr. Manning to-night." And Winchester told him that he would do so.

The importance of this evidence will be perceived when we consider that the cost of repairing the twenty-six machines, at an average of $25 each, would amount to $650, and that they had at that time been exposed to the rain coming through the roofless floor above for five months. The only other injury to the machinery in that room was to the belting, shafting, hangers and pulleys, which was comparatively trifling.

Winchester returned to New York and immediately telegraphed Manning, and the next morning got word from him saying that it was impossible for him to get to New York before the next Wednesday, which was about a week off, and that the parties would have to get another man. Winchester called Atherton up on the telephone and stated to him the substance of the telegram from Manning, whereupon Atherton answered him in a cross tone, demanding why he had not come over to Paterson the first thing that morning, to which Winchester replied that he understood that it had been agreed between them that he should not go over, and that he, Winchester, was not to come to Paterson till Manning had arrived, and that Manning had been sent for at his, Atherton's, suggestion, and that he was doing precisely what Atherton had requested him to do. Atherton replied:

"Well, I have changed my mind, and I don't want Mr. Manning; I have my pay-roll to make up, and can't have anything more to do with it until next Monday morning."

To which Winchester replied that he would come over at half-past eight the next morning (Saturday, October 5th) if Atherton could give him his attention. Atherton agreed to that and fixed a meeting at the mill at half-past eight the next morning.

On the morning of the 5th Winchester went to Paterson to Landau's mill, and there found Atherton, Landau and a man who was said to be an accountant, who had been previously introduced to him by Landau. Winchester asked the man if he

was there to take notes of what he said; he said no, he merely happened in. Then Landau spoke up and said: "How is it, Mr. Winchester, that you have to go so far away from home for a third man; are there not any honest men in Paterson?" (This shows that he had been informed by Atherton of the state of affairs and expected a disagreement.) Winchester replied:

"Without doubt there are honest men in Paterson, but there has been so much said about your loss [Mr. Landau had previously spoken to him about there being articles in the papers about it], even pieces in the press speaking of your loss, that it is the part of wisdom for the appraisers to choose a man who has no social or financial bias, a man of well-known integrity and ability, who does not live in the place where the fire occurred, and who is not connected in any way either with the insurance companies or the assured; and that is the kind of man you have in Mr. Charles H. Manning."

About that time the Mr. Morrison, previously referred to, came into the mill and was introduced to Winchester by Landau as a gentleman who had made an *ex parte* appraisal; and Winchester said:

"Mr. Morrison, I don't want you to make any expression in regard to this loss. It is not what you think about the loss, what Mr. Landau thinks about the loss, what the insurance companies think about the loss; but it is what Mr. Atherton and I, or the umpire, think about the loss."

Winchester perceived from something that was said in conversation before they proceeded with their work that Atherton had disclosed to Landau the confidential conversation which they had had on the previous occasion under the promise of secrecy, and this is given by Winchester as an excuse for having subsequently communicated it to the parties.

Winchester and Atherton then went by themselves into the room (No. 1), where they were before, and took up the work of looking over the machinery at the very place where they stood when the $20 and $25 damage to each machine was spoken of. After Winchester had handed Manning's telegram to Atherton, the latter asked Winchester, "Did you ever build any of this machinery?" to which Winchester replied, "No, sir; I have neither built it nor run it." "Then," says Atherton, "you are

not competent, and I refuse to go on with the loss with you;" adding, "I know all about this stuff; I built it and run it, and know everything about it." Winchester replied:

"If you know all about it, and I am so green and don't know anything about it, why are you afraid of me? You and Mr. Manning will have it all your own way."

Winchester also said, "You keep a bank account and come in contact with the president and board of directors?" And Atherton replied, "Yes, sir;" and Winchester said:

"I don't know how you can reconcile that kind of action [refusing to go on with the appraisement] to that class of men. Did you not hold up your little hand and take your oath before a notary that you would go on and appraise this loss with me, and that if we disagreed, that Mr. Manning should decide the difference?"

Atherton said, "Yes, sir;" and Winchester replied, "Well, you may have some way of explaining this matter to those men. If this is your idea of honor, I do not see that I can change it." Atherton then said to Winchester, "Well, come on, let us see what you know about this stuff, anyhow," and asked him the price per spindle of several machines, and Winchester named a price. Atherton then turned to Winchester with a disgusted air, saying, "You don't even know the price per spindle that these machines are worth." Winchester then answered Atherton and said, "I have answered your three questions; now will you please tell me what the price per spindle of these three frames is?" And he started in and named the market price per spindle of a new modern machine of the same class at that day. Winchester then asked him, "What do you consider the damage to these machines?" And Atherton replied, "I consider the damage upon those sixty per cent." (I stop here to say that that would be at least ten times as great as the figure named by Atherton two days before.) Winchester then said, "What do you consider the damage on the entire property in this room?" "Mr. Atherton then put his hands in his pocket and pulled out a schedule and looked at it. I looked over his shoulder and saw one page of it, and he read from it—[I stop to say that Landau

American Central Ins. Co. *v.* Landau.

afterwards told Winchester that the paper which he had was Morrison's appraisement]—it was rising $7,000, but he read $7,000." Winchester said:

"You are a builder of this machinery, run it, and know all about it; do you think it is proper for you to put your hand into your pocket and read some other man's appraisal, and read it off to me as a price? Do you think that is right?"

He said he didn't know why it was not honorable. Winchester then said, "I am disgusted with this kind of business. Come into the office." They then went into the office. Winchester said to Landau that they would have to call in the umpire, that Atherton and he had disagreed, and the umpire must settle it. Atherton spoke up and said:

"This man is incompetent; he does not know anything about the machinery, and I refuse to go on with the loss with him; I will not have anything more to do with it."

Landau said, "Will you please write me a note to that effect, or perhaps you had better write it to my attorney." When Atherton said he would have nothing more to do with it Winchester said:

"It is immaterial to me, Mr. Atherton, whether you do or not. I shall send for Mr. Manning as you requested me to do; when he comes I shall notify you, give you proper notice, and if you do not come in Mr. Manning and myself will go on and appraise the property without you."

Landau spoke up and said, "You can't do that; the only thing that Mr. Manning can act upon is the articles upon which you and Mr. Atherton disagree;" to which Winchester replied, "We have disagreed upon the articles separately and we have disagreed upon them collectively as a whole." Atherton heard this and made no response to it. Mr. Winchester then asked Mr. Landau if he considered it honorable to give his referee documents to appraise by, and he replied that he did not know why it was not; and Winchester then said, "This looks to me like a damned swindle."

Winchester then returned to New York and waited for Man-

ning to come on. On October 10th they—Winchester and Manning—procured a lawyer from the office of Cardozo & Nathan to go with them to Paterson. Notice, in writing, was given to Atherton to proceed with the appraisement. He declined to do so, and Manning was sworn in as umpire before the same notary, and they proceeded to Landau's mill, saw him there, and Landau produced a letter from Atherton declining to proceed as appraiser. This letter was offered in evidence but not received because it contained the writer's reasons for declining; but it was admitted that the tenor was to the effect that he declined to go on. They then gave Landau a further hearing, and proceeded to make their appraisal in detail. Before they began Landau said he had a written notice prepared to be served upon them, but was at a loss whether to serve it or not, and asked what would be the effect of his serving a notice on them, saying, "If I should serve on you a notice that I have, and I am satisfied with your award, could I get my money?" Winchester replied that it seemed to him that it would cut both ways; if it would relieve Landau it would relieve the companies. Landau declined to serve it at that time.

After Manning and Winchester had completed their examination of the machinery, which was done in detail, and had made an examination of each piece and measurements of the shafting and the counting of pulleys and hangers necessary to enable them to make an estimate of the injury, and as they were about to leave the building, or were on the way to the railway station, where Landau accompanied them, he served a typewritten notice on them, which had evidently been prepared by counsel. That notice is as follows:

"*Messrs. Edward S. Winchester and Charles H. Manning:*

"GENTLEMEN—Regarding your application to me to be permitted to proceed with an appraisal under the insurance policies and agreement entered into in regard thereto, I have this to say, that I am entirely willing that you should examine the property to be appraised, and I shall be happy to give you any information in regard to it without regard to the legal effect of your investigation, and I know of no reason why you should not be permitted to inform yourselves as to the extent of my loss. I desire, however, to notify you that my admitting you to my premises and giving you information or assistance in your work are not to be taken as

American Central Ins. Co. *v.* Landau.

any admission on my part that you have any *status* as appraisers, nor must you or any person suppose that any conduct of mine while you are doing the work which you set out to do in this matter is to be construed as a waiver of any rights or an acquiescence in your work of appraisal or an admission that your appraisal is valid or binding upon me for any purpose whatsoever. With this plain statement, I desire to show you all possible courtesy under the circumstances.

"Yours truly,

"Dated October 10th, 1895.               G. W. I. LANDAU."

As they left the building, or while on the way to the station, Mr. Landau volunteered to give Messrs. Winchester and Manning two schedules. One of them containing a statement of sound values and losses, which he said was the same that he had furnished to Atherton and which Winchester inferred was the one Atherton used in his attempt to appraise the previous week. (I stop here to say that this paper was subsequently returned to Landau by Winchester.) The statement was made up according to Landau's notion. Some difficulty arose at the hearing in identifying this among numerous other documents, but finally it was accomplished by the production of a copy with a memorandum upon it in Winchester's own handwriting, made at the time, stating that Landau had told him that he had given a copy to Atherton. At the railway station Landau stated to Winchester and Manning that he was in their hands and hoped they would give him a satisfactory award. Winchester and Manning then proceeded together to Boston, and went over their list and their memoranda and made up and signed in duplicate the award in question and forwarded it to the respective parties.

Mr. Landau, in his rehearsal of what occurred between Atherton and Winchester, in his presence, and also between himself and Winchester, states many matters as having occurred and words having been said which are specifically denied by Winchester and not sustained by the calling of Atherton. In weighing these contradictions I have generally adopted the version of Winchester. He made full memoranda in the letter before alluded to and is apparently a highly respectable gentleman and entirely disinterested, except so far as naturally desirous of sustaining his own conduct and award. And the

question now is, is this award lawful and binding upon Mr. Landau? In considering it we must bear in mind that the appraisement was demanded by Landau—so admitted at the hearing—and that such proceeding was a part of his remedy against the insurers.

Following the clause under which the proceeding was had is another, in this language:

"No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity until after full compliance by the insured with all the foregoing requirements, nor unless commenced within twelve months next after the fire."

This language varies in some respects from that under consideration in *Wolff* v. *Insurance Co., 21 Vr. 453.* In that case the language was:

"It is expressly provided and mutually agreed that no suit or action against the company shall be sustainable in any court until after an award shall be obtained fixing the amount of such claim in the manner above provided."

I am inclined to think that the clause found in the policies involved in the present case requires that an attempt at least should be made to procure an award.

The question whether the appraisal was a condition precedent is not here involved; but I stop to say that it depends upon the true construction of the contract of insurance taken as a whole, applying to it the fine distinctions adopted in the case of *Scott* v. *Avery, 5 H. L. Cas. 811 (1854).*

But be that as it may, it was a proceeding contemplated by the contract and one which was open to both parties, and he who first set it in motion did so for the benefit of both parties; the insurance companies were justified in believing that it was taken in good faith and in refraining from calling for an appraisement on their own account; so that each party was under equal obligation to proceed in good faith to complete the appraisal when once entered upon.

Neither could, in my judgment, revoke it. The affair assumed the position of a reference by rule of court, in which it is well

.American Central Ins. Co. *v.* Landau.

settled that the submission is not revokable. *Freeborn* v. *Denman, 3 Halst. 142; Ferris* v. *Munn, 2 Zab. 161; Caldw. Arb.*
*\*29 (2d Am. ed., 1853,* at *p. 77*).

Another matter to be considered is that the proceeding here is not an ordinary arbitration where the parties hear witnesses and appear by counsel and act upon sworn evidence only; but it is strictly an appraisal and ascertainment in a particular manner of the amount of the loss, made by two or three parties, as the case may be, in which they act upon their own judgment, with such information as they may obtain in an informal way, and in which the appraiser chosen by each party is supposed and expected, in a restricted sense, to represent the party appointing him and within reasonable limits to see to it that no legitimate consideration favorable to the party so appointing him is overlooked by the other appraiser.

With these preliminary observations we come to the consideration of the arguments advanced for and against the validity of the award in this case.

The principal objection raised against it is that the two appraisers (Atherton and Winchester), in the prosecution of their duties, never reached the point of disagreement so as to authorize the calling in of the umpire (Manning) ; and the argument of counsel for Mr. Landau, in support of that position, is that his appraiser (Atherton) never tried, in good faith, to agree with Winchester, but, in effect, according to Winchester's evidence, studiously avoided any honest attempt in that direction; and further, that before Mr. Manning and Mr. Winchester proceeded, the submission was substantially revoked by the withdrawal of Atherton.

Both parties rely upon the case of *Broadway Insurance Co.* v. *Doying,* decided by the court of errors and appeals, as reported in *26 Vr. 569.* Before considering the application of that case, it is proper to observe that the submission in the *Doying Case* did not correspond with, but was variant from, the clause in the policy; while in this case, as we have seen, the submission is substantially in the same language as the policy.

One of the refusals to charge as requested in the *Doying Case,* and excepted to, was "that the umpire could not act unless the

appraisers had come together and had disagreed, and that, as that was not the situation in this case, the umpire had no power to act and the award was not valid." This exception was dealt with by the court above in this wise: "The uncontradicted testimony was that the appraisers had together examined the goods in question, and that their examination had resulted in a difference of opinion as to the damage done by the fire, Collins thinking the damage done was fifty per cent. of the face of the policies, Berrian thinking it was more. Whether this difference of opinion was such a disagreement as would justify calling in the umpire might depend on circumstances. The court [below] could not lawfully determine that, under all the evidence, the umpire had no authority to intervene, and therefore did not err in refusing to charge as requested." Then follows what I understand to be a mere *dictum* and statement of a general principle: "That portion of the charge which is excepted to would be subject to criticism if considered abstractly. Under the agreement between the parties, the refusal of one of the appraisers to appraise, whether in good faith or in bad faith, would not give jurisdiction to the umpire. He was empowered to act only 'in case of disagreement' [in the case in hand, "failing to agree"]—*i. e.*, in case the appraisers had considered the matters submitted to them and had formed and expressed to each other different opinions concerning them. But," the learned justice continues, "when viewed in the light of the uncontradicted testimony, the charge does not seem to be prejudicial to the defendant. If, after the appraisers had examined and conferred about the damage done, *they had reached and expressed to each other different estimates of its amount, and thereafter one of the appraisers, in bad faith, endeavored to prevent further conference,* or to postpone such conference for some ulterior purpose, then the other appraiser, acting in good faith, would have a right to regard their difference as a final disagreement, and thereupon to call in the umpire. The contract did not require that the appraisers should concur in summoning the umpire to settle their differences, but whenever, in fact, a disagreement arose between them, he became qualified to act, and with either of them might make a valid appraisement of the matters

on which the appraisers had differed." In the present case the appraisers did join in summoning the umpire.

The charge of the judge in that case was: "If the jury were satisfied, from the evidence, that one of the appraisers was acting in bad faith and really endeavoring to defeat an appraisement altogether, or postpone it for some ulterior purpose, the other appraiser, acting in good faith, had the right to call upon the umpire," &c., and this part of the charge was approved on appeal.

Now, in the present case, the facts are that, at the first meeting of the appraisers, there was substantially no disagreement in their views as to damages. They had not gone through the whole items of loss, but they had seen all the property, and went far enough to show that there was no substantial disagreement; but Mr. Atherton stated frankly that he was expected by Landau to make a dishonest appraisement—one that his conscience would not approve—and that he should formally disagree with Mr. Winchester, and the arrangement between them was that Winchester was to call in the umpire. His object was to avoid the responsibility of making an appraisement. But the next day, after conference with somebody—and it is perfectly plain, from all the facts, that Atherton was in communication with Landau, and that Landau was acting under advice of counsel—Atherton changed his mind, and desired Winchester to come and make an appraisement; and then, when they came to look over the property again, Atherton, after treating Winchester discourteously, asked him to put a value upon the machines by the spindle (the usual mode of pricing them), and Winchester named a value per spindle, which Atherton at once disagreed with, and spoke of contemptuously and accused Winchester of ignorance and incompetence. Winchester then asked Atherton to state his value per spindle, which he did. Then Winchester asked Atherton to state his views of the damage to the machines, to which Atherton replied, fixing it at sixty per cent. upon their value. Winchester then asked Atherton what he thought was the lump damage to the silk machines on that floor, and Atherton, using an appraisement already made up by some other person and handed to him by Landau, advanced his notion of the damage to ten times the amount which he had fixed two days previously, and behaved in

American Central Ins. Co. *v.* Landau.

a most discourteous manner to Mr. Winchester, and Winchester then disagreed at once with Atherton's estimate—that is, when Atherton estimated the damage to the silk machinery in room No. 1, where the bulk of the machinery was, at $7,000, which was so much more than they talked of two days previously, Winchester at once said: "It is no use to proceed further," and in this Atherton acquiesced. That amounted to a substantial disagreement.

Now it is perfectly plain that Atherton intended either to bring Winchester to his views or to break up the appraisement, and that he was acting in the interest of Landau, for he used an appraisement already prepared by Landau in fixing the damage in that one room. In this situation I find it impossible not to consider what passed between the two appraisers at that time as an absolute disagreement between them. Winchester declared, when the two came out together into Landau's presence, that they disagreed. That was tantamount to saying, "I disagree with Mr. Atherton."

It was not, in my judgment, necessary or even worth while at that time, after having disagreed so largely as to the damage done to the machinery in room No. 1, that they should, before calling in the umpire, proceed through the other rooms and look at the articles there, or so much of them as remained unconsumed. It was a mere waste of time to do so, and it was work that could properly be deferred until the umpire came in. If they had agreed upon some of the articles such agreement would not have saved the calling in of the umpire. Besides, there is no probability they they would have so agreed.

I am further decidedly of the opinion upon the facts that the case is brought within the rule laid down by the judge at the circuit and approved by the court of errors and appeals in the *Doying Case,* to wit, that Atherton was acting in bad faith and really endeavoring to defeat an appraisement altogether, and that he was doing that in the interest of Landau, who had chosen him.

But counsel for Landau insists that a mere disagreemnt is not sufficient to give the umpire jurisdiction, but that in order to make it efficient for that purpose it must be the result of an

honest attempt by each appraiser to appraise, and that Atherton made no such honest attempt; hence the jurisdiction of the umpire never arose. This position—he argues—is sustained by the language of the court of appeals in the *Doying Case* (already quoted, but here repeated), as follows: "Under the agreement the refusal of one appraiser to appraise, whether in good faith or in bad faith, would not give jurisdiction to the umpire. He was empowered to act only 'in case of disagreement'—*i. e.,* in case the appraisers had considered the matters submitted to them and had formed and expressed to each other different opinions concerning them." Now in this case it distinctly appears, as above stated, that on October 5th, while going together in the exercise of their duties through room No. 1, where the majority of the machines, both in bulk and value, were situate, Winchester and Atherton did come to a distinct "disagreement"— quite as decided as that dealt with in the *Doying Case.*

Further: I am unable to adopt the view of counsel for Landau that, in a case like this, where the submission to arbitration, as has been before observed, is a part of the original contract between the parties and furnishes a proper and convenient mode, if not the exclusive mode, of ascertaining the damages, the jurisdictional disagreement must be the result of an honest endeavor on the part of each appraiser to make an actual appraisement such as satisfies the conscience of each. How, it may be well asked, are the parties to know whether the disagreement is honest or not? To lay down and maintain the rule contended for would put it in the power of either party, if aided by an unscrupulous appraiser appointed by him, to invalidate any award which might be made, and deprive the other party of the benefit of that part of the contract. Moreover, it would promote and encourage a practice which has met with universal disapproval and condemnation by the courts, namely, that of experimenting upon the result of the award. On this subject I refer to what I said in *Hewitt* v. *Railroad, 12 Dick. Ch. Rep. 511* (at *p. 521*). In the present case Landau did not attempt to revoke the submission after he knew of the disagreement, and after, as I am satisfied, he knew just how his appraiser had behaved and his motives in so doing, but permitted the other

appraiser and the umpire to proceed and make their award, evidently with the view of accepting it if it was favorable to him, and using the misconduct of his own appraiser to defeat it if it was not satisfactory to him; for I cannot view the letter which he delivered to the appraiser and umpire after they had finished their examination of the machinery as a revocation of the submission; and the evidence of Winchester, Manning and Hull as to his language and conduct at the railway station, shows plainly that he was willing and desirous that the appraiser and umpire should proceed with their work, expecting to accept it if favorable to him, but to repudiate it if unfavorable. This attitude does not merit the approval of a court of equity.

But to return to the *Doying Case.* It is plain that the disagreement in that case was dealt with at the trial at law as if the absenting appraiser had been all the time acting in bad faith. Be that as it may, I do not understand that the learned judge, who spoke for the court in that case, had in mind or intended to include in the category above stated a case like the present, where, on the theory of the counsel for Landau, an appraiser acting, as he thought, in the interest of the party appointing him, deliberately plays a part and states to his co-appraiser an opinion as to the extent of the damage which he does not himself entertain, and which he must know his co-appraiser will probably refuse to accept, so acting for the purpose either of brow-beating his co-appraiser into adopting to some extent or degree his insincere statement of value, or, failing in that, to break up the proceeding. Besides, whatever might be the view of the result which might be taken in a court of law, I am decidedly of the opinion that it would be inequitable and unjust to permit the party whose appraiser had so misbehaved himself to take advantage of such misbehavior.

But the counsel for the defendant takes the further position that the result of Atherton's formal resignation of his office and duty as appraiser was to work a revocation of the original submission and put an end to the power of the appraiser of the insurance companies and the umpire to proceed and make an award. I have already expressed the opinion that after the affair had proceeded as far as the appointment of the umpire

and the qualification of the two appraisers, it was irrevocable; and certainly after the appraisement had been proceeded with by the two appraisers to a disagreement between them, the award made by the umpire and one of the appraisers cannot be vitiated by the refusal of the other appraiser to take part in the further proceeding, even though such refusal be accompanied by a formal resignation. I think the *Doying Case* is distinct authority for this opinion, since I cannot perceive how the formal resignation adds anything to the effect of the simple refusal to act.

Besides, awards that are bad at law for a defect of the character here in question are sometimes upheld in equity. *Harcourt v. Ramsbottom, 1 Jac. & W. 505.* In that case the one party executed a formal revocation of the submission, and Lord Eldon (at *p. 492*) says: "Supposing the revocation to be good at law, this is a case in which a court of equity would not act. I am not saying it is good at law, but I agree entirely that it is bad in equity, under these circumstances. If so, what is the case of the plaintiff? He has said, for many reasons stated in the deed of revocation, I have revoked the authority. Mr. Cullen says, you cannot. Now, when a party informs the arbitrator that he revokes his authority, if the arbitrator is of opinion that his authority is gone, he has nothing more to do with it; but if the arbitrator thinks he has no right to do so, and the party will not submit, is that to stop him? Supposing his opinion to be right, that his authority is not revoked in equity, see what the consequences would be." He then proceeds to hold that one party having, from a chancellor's view, ineffectually attempted to revoke his submission and refused to attend, the arbitrator may proceed *ex parte,* without giving him notice.

And in *Pope* v. *Duncannon, 9 Sim. 177,* Vice-Chancellor Shadwell held the same view. In that case there had been a contract to purchase land, with permission to take immediate possession, the amount to be paid to be ascertained by arbitration. The learned vice-chancellor said: "By the terms of the contract the commissioners agreed to purchase, and the Messrs. Pope agreed to sell, the premises at such a price as any two of the referees should determine; and there can be no doubt that the authority

thus given to the referees to fix the price, was an authority which the Messrs. Pope might revoke at law; and, as they have revoked it, the power of the arbitrators is completely destroyed at law. The plaintiffs then apply to this court to restrain the commissioners from taking possession of the wharf and pulling down the buildings upon it; but neither in the bill nor in the affidavit in support of the motion is any sufficient reason stated for revoking the authority of the arbitrators. The affidavit alleges, not that the plaintiffs *had* just grounds, but, merely, that they considered that they had just grounds for being dissatisfied with the conduct of the arbitrators; and, in my opinion, that mode of allegation is not sufficient to induce this court to interfere." Then, after referring to *Harcourt* v. *Ramsbottom,* he says: "I observe that, in *Morse* v. *Merest,* Sir John Leach, vice-chancellor, states that in equity a defendant is not permitted to set up a legal defence which grows out of his own misconduct; so, varying the terms of the proposition, I say that a plaintiff is not at liberty to ask the aid of a court of equity in respect of an act done by him against good faith. And as, in this case, there is nothing whatever to show that the power which the plaintiffs had given to the arbitrators was revoked upon any just or reasonable grounds, I am bound to conclude that the revocation was a wanton and capricious exercise of authority on their parts, and consequently the motion must be refused."

I think the circumstances of the case show that it is highly inequitable for Landau to repudiate this award.

There is no authority for the position that both appraisers must attend before the umpire after the disagreement. Not only the *Doying Case,* but many others hold the contrary. *Carpenter* v. *Wood, 1 Metc. 409; Crofoot* v. *Allen, 2 Wend. 494; Maynard* v. *Frederick, 7 Cush. 247.* See *Morse Arb. 154, 156.* At *p. 156* he says:

"Russell lays down the same rule as constituting the law in England. 'Under such a submission,' he says, using the very language of the court in the cited case of *Dalling* v. *Matchett,* 'it will be sufficient for any two of the arbitrators to act jointly, though the third from obstinacy, or the desire of a party or business, or any other cause, absent himself from the meetings, provided he have full notice and opportunity of being present at them if he please, and be not kept away by any practice of the other

arbitrators or of the parties. Otherwise it would be in the power of one of the parties to trick the other and entirely to defeat him of 'the benefit of the reference.' This latter remark, it has been said in a Massachusetts case, 'would apply more strongly where one of the referees should withdraw after the hearing before all of them.' After a submission has once been entered into, it is not in the power of one of the arbitrators to annul or avoid the agreement by withdrawing from the trust."

And see statement of the rule, with the authorities collected, in the opinion of the court of appeals of New York, in *Bulson* v. *Lohnes, 29 N. Y. 291* (at *p. 293*). After the decision of *Crofoot* v. *Allen,* a statute rendered it necessary that all the arbitrators should be present at the hearing.

But it is further urged by counsel for Landau that the conduct of Atherton in withdrawing from the appraisement was not in accordance with his wish, nor done in his interest, and that the result of the withdrawal was that he lost the benefit of Atherton's presence at the appraisal and his influence upon the other appraiser and umpire. I do not think the evidence in the case warrants the conclusion that Mr. Atherton's withdrawal was against the consent of Landau and not done in his interest. But granting the truth of Landau's contention in that respect, it seems to me that his remedy for this deprivation was quite clear. As soon as Atherton formally withdrew and resigned, which was on the afternoon of October 5th, the day of the second meeting between the two appraisers, Landau should have at once appointed another appraiser to act in his place, and demanded of the insurance companies that such nominee should appear in his behalf before the other appraiser and the umpire; or, it may be, that he would have the right to ask that the new appraiser so appointed by him should first attempt to agree with the other appraiser, Winchester, before the intervention of the umpire. The propriety of this course seems to me to spring from the character of the contract in the policies of insurance. I am unable to accede to the proposition that the rights of either party to have the appraisal proceed and the loss ascertained in the mode specified in the contract could be affected or destroyed by the refusal to act at so late a day of either of the appraisers so appointed.

It is quite plain that Mr. Landau was not at any time acting unadvisedly, for, as already stated, it appears that when Atherton and Winchester appeared at his office on the morning of October 5th he anticipated a disagreement and probably also the withdrawal of Atherton and the intervention of the umpire, for he asked Winchester why he, Winchester, was not willing to have as an umpire some good man in Paterson instead of going to New England for one; and he had ample time between the 5th, when Atherton withdrew, and the 10th of October, when Winchester and Manning appeared, to consider the situation and to offer to appoint another appraiser in the place of Atherton. If he had made such offer to the insurance companies and it had been refused, a different question would be presented. In making this suggestion I have not overlooked the consideration that such a proceeding might be abused by a party seeking to make trouble. I do not intend to suggest that the appointment of a new appraiser would oust the jurisdiction of the umpire and result in any retrogression. I confine it strictly to giving the party, whose appraiser has deserted him after the umpire is appointed, the benefit of having a representative present when the appraisal is actually being made, with opportunity to influence the result.

The objection taken by the answer to the competency and impartiality of Messrs. Winchester and Manning was substantially abandoned at the hearing. Their examination on the stand was a complete vindication. Winchester was bred a machinist, and carried on the business of manufacturing and selling machinery for years. He had acted as appraiser of fire losses to machinery in many instances, sometimes acting alone, and sometimes being chosen as appraiser by the insurance companies and sometimes by the sufferers from the fire loss. He was not especially skilled in silk machinery, but had seen it and posted himself by visiting a large factory of that kind of machinery in Stonington, Connecticut. It is to be remarked that the machinery covered by these policies was simply a throwing plant, that is, a plant which takes raw silk after it is wound from the cocoon and reeled into hanks, and doubles and twists it into silk threads of varying size and strength, according to

American Central Ins. Co. *v.* Landau.

the needs of the dyer and weaver. It is not even a spinning plant, in the proper sense of the term, because it does not elongate the fibre by drawing it out, as is done in the case of wool and cotton, but it simply reels and twists it. The words "throw" and "throwster" mean "twist" and "twister," and a throwing plant is merely a twisting plant.

Samples of parts of the machinery were offered in evidence on the question of the amount of damage, and elaborate descriptions given of the machines. I shall not attempt a description, but will content myself with saying that at the request of the parties I visited the silk-throwing plant of Mr. Singleton, a witness in the cause, at Dover, New Jersey, and was somewhat surprised to find the machinery quite a simple affair. The parts of the machinery which carry the power from the engine to the parts which come in contact with the silk consists of the ordinary gearing, namely, shafting, pulleys, belts and cogwheels, which are found in all textile machinery. The parts with which the silk comes in contact were principally spools or bobbins, with traverse motion-guides to distribute the threads evenly while being wound on the spools. The throwing or twisting consists of unwinding the silk from one bobbin or spool and winding it on to another, while both are revolving, and thereby giving it a twist. The doubling or trebling, as the case may be, is accomplished by combining the threads from two or three spools into one cable, twisting that by the same rotary motion, and winding it on to a spool or bobbin. Then it is wound off the bobbin to a reel and put in the shape of a hank or skein. It was suggested that no one but a manufacturer of throwing machinery, or a practical throwster, could determine the amount of injury done by smoke and water to these machines, or, in other words, could determine the amount of expense in labor, &c., necessary to restore them to their former condition. I am unable to adopt that view and am entirely satisfied that Mr. Winchester, and especially Mr. Manning, who was familiar with the more delicate and intricate machinery used in spinning and twisting cotton, were both entirely competent to make such an estimate and appraisement.

There remains now the single objection that the award is so

far below the actual loss as to show improper conduct on the part of the appraiser and umpire. Upon this part of the case an immense amount of evidence was given on each side by expert silk machinery manufacturers and silk throwsters. I gave close attention to their evidence as it was being given; I have since read it with care, and the clear weight of the evidence is that the award in this case was sufficiently liberal to Mr. Landau.

This disposes of the most important question presented by the pleadings. But they raise other issues, namely, first, whether there was any sufficient reason for coming into this court. This was placed in the bill mainly on the ground that, by the interlacing and overlapping of the policies, it was impracticable to assert the award at law. This interlacing and overlapping is denied by the answer. Then, in the second place, the cross-bill prays that if the award be not sustained by this court, and the court should be of the opinion that the case is a proper one to be taken from a jury, this court will ascertain the damages.

In view of the possibility of another court differing with me in my judgment as to the validity of the award, I feel it my duty to go into these several questions.

First, as to the propriety of withdrawing the case from the law courts if the award be valid. I find that, upon close examination, there is not so much variation in the several descriptions of property leading to overlapping and interlacing as my reading of them in considering the case on demurrer led me to suppose; and if that were the only difficulty in the way of establishing at law the defence of the award, I might hesitate about continuing the restraint in that regard. But all the other considerations which influenced me in the former decision remain in full force, with some additions, which I will mention.

First, it appears that the problem of adjusting the loss between the several insurers is rendered difficult by the fact that one or two of the policies are what are called blanket policies, covering the machinery in the several buildings, and underwriting it for a round sum; while the others are what are called specific policies, and while covering the same machinery, limit their loss to a fixed sum on each separate parcel of machinery as found in the different rooms. This situation, according to the expert in-

surance adjusters who testified on that subject, complicates the problem, and renders it well nigh insoluble.

Then another consideration comes in. The evidence, including the very proofs of loss prepared by the defendant's own adjuster, shows that, at best, the problem is tedious and difficult, and, in fact, requires the attention of a skilled expert. These facts lead in the same direction. The number of articles injured is great, and the evidence as to each is technical and voluminous, so that the case is brought fully and clearly far within the rule laid down by me, after careful consideration, in *Cranford* v. *Watters, 16 Dick. Ch. Rep. 284,* as follows: "Where the issues necessary to be determined, in order to arrive at a just conclusion, are so numerous, and depend upon such a variety of evidence, or evidence of such technical character, as that it is substantially impossible for a jury, retiring in the ordinary way to a jury-room, and obliged to carry all the oral evidence in their memories, to come, at one session, to anything like a just and proper conclusion, the court of equity will intervene and withdraw the litigation from a law court."

Upon the whole case I come to the conclusion that the difficulty which a jury would have in arriving at a just conclusion, amounting in this case practically to an impossibility, and the great multiplicity of suits necessary at law, and the difficulty the complainants would have in maintaining their defence, as shown in my former opinion, made it highly proper for this court to retain its jurisdiction.

This conclusion, and supposing that a court of review may differ with me as to the validity of the award, brings me to the prayer of the cross-bill, that the loss sustained by the defendant be ascertained in this court. On this topic, as before remarked, a large amount of evidence on each side was produced, and much time spent in argument.

The parties differed radically as to the principle upon which the loss should be ascertained.

Let us consider the terms of the contract. It is that the insurance company

"Does insure  *  .*  *  against *all direct loss or damage by fire*, except as hereinafter provided  *  *  *  the following described property *while*

*located and contained as described herein, and not elsewhere.* \* \* \*
This company shall not be liable beyond the *actual cash value* of the
property at the time any loss or damage occurs, and the loss or damage
shall be ascertained or estimated according to *such actual cash value,*
with proper deduction for depreciation however caused, and shall in no
event exceed what it would then cost the insurer *to repair or replace* the
same with material of like kind and quality; said ascertainment or esti-
mate shall be made by the insured and this company, or, if they differ,
then by appraisers, as hereinafter provided: and the amount of loss or
damage having been thus determined, the sum for which this company is
liable pursuant to this policy shall be payable sixty days after due notice,
ascertainment, estimate and satisfactory proof of the loss have been re-
ceived by this company in accordance with the terms of this policy. It
shall be optional, however, with this company to take all or any part
of the articles at such ascertained or appraised value, and also to repair,
rebuild or replace the property lost or damaged with other of like kind
and quality within a reasonable time, on giving notice, within thirty days
after the receipt of the proof herein required, of its intention so to do;
but there can be no abandonment to this company of the property de-
scribed."

Now, in construing these sections and applying them to the
case in hand, it must be borne in mind that the machinery was
all situate in a building or buildings owned by the insured, and
that the fire destroyed the roof or upper part only of the main
building, and rendered it, without a restoration, untenantable,
by subjecting it to the inroads of the elements, and that the
defendant (the insured) determined that he would not restore it
for the purpose of a silk-throwing plant, with the result that all
the machinery, as well that seriously injured as that only injured
by water and smoke, and which constituted the great bulk in
value, was finally removed from the building and sold, some for
old junk and some for second-hand machinery.

Now coming to the positions taken by the counsel of the
several parties.

The counsel for the insurance companies contends that in
ascertaining this loss or damage there can be no allowance made
for mere interruption of business, and this is conceded by
counsel for the insured. The soundness of this result is mani-
fest. To ascertain the amount of loss resulting from the inter-
ruption of business it would be necessary to inquire whether
the business was being conducted at a profit or not; and in
that connection the proper rental of the building would be an

element, and a variety of other matters which will at once suggest themselves to every mind.

But the counsel for the insured contends that the proper mode of ascertaining the loss is as follows: first, to ascertain the total value of the aggregation of machinery assembled, as it was, and —as is contended by the insured—so assembled in proper proportion for a going business of throwing silk, and actually in use for that purpose, covered by a good and sufficient building, with unlimited right of continuing occupation, precisely as it was before the fire; and then, second, to ascertain the value of the same machinery, or such as remained, as it stood after the fire, with the building in which it stood so far injured by fire as to be untenantable and insufficient to protect it from the elements, and the owner indisposed to repair and rebuild the same and make it fit for use and occupation by such machinery, and that the difference between such subsequent and previous value is the amount of loss.

It was admitted that the application of this rule, if it be a sound one, would greatly increase the loss over and above what it would cost to repair and restore the machinery to its former condition.

On the other hand, the position of the counsel for the insurers is that the rule so propounded would compel the insurance companies to pay for losses which they never insured against, namely: first, an interruption of the business; second, for injuries not the direct result of the fire upon the machinery, but clearly the result of the burning of the building and the change of mind of the owner as to his desire to continue its use for that purpose, and third, it would lead to paying a greater sum for loss than the cost of restoration or replacing of the machinery.

But for the very able and ingenious argument of the counsel for the insured I should suppose that the position taken by him was not arguable. A single illustration, put at the argument, seems to me to state and also solve the question. Suppose the roofs of all the buildings had been destroyed by fire and no other injury had been done to the building; and none whatever, not even by smoke and water, to the machinery, how could it

American Central Ins. Co. *v.* Landau.

be said that any loss to the machinery had arisen which was covered by the policy of insurance? The machinery would have remained intact and uninjured. The building would have become untenantable; and if the owner of the building had been, as he was, actually indisposed to continue to use it for a silk-throwing plant, the value of the machinery would have been undoubtedly greatly depreciated, and yet it would be impossible to suppose that the underwriters of the machinery would have been liable to pay one cent.

In fact, in the case supposed, the loss would have arisen, first, from the interruption of the business by the fire; and second, from the indisposition of the owner of the building to rebuild it for the purpose for which it was previously used.

Suppose, again, that the building was owned by A and the machinery by B, and B's tenancy was from month to month, and the building rendered untenantable by fire and the machinery uninjured, the same result appears in a clearer light. The owner of the machinery would have no right to require the owner of the building to rebuild it; and although he had a plant properly proportioned in all its parts, in full operation, yet he had no permanent right of occupation of the building, and could not compel his landlord to pay him damages by reason of the destruction of the building.

Again, in the case last supposed the owner of the machinery would suffer the same loss precisely from a month's notice to vacate the building with the machinery, without any fire, as he would from a fire which burnt off the roof and left his machinery uninjured. I am unable to see why he should have any right of action against the insurer in one case rather than in the other.

The result is that the loss must be confined to the cost of reparation, or, in case of total destruction, to the value of the machinery as if not in use.

[Omitting discussion of evidence.]

Without going further into details, I find the great weight of the evidence to be in favor of Mr. Nightingale's appraisement; and if the matter were submitted to me I should not be willing to award over $5,000 for damages. The amount awarded by Messrs.

Winchester and Manning was $5,936.90, and as the award is sustained at the instance of the complainants, the decree will be upon that basis.

I will advise a decree establishing the award as binding upon all parties, and that a perpetual injunction against the actions at law do issue, upon the complainants paying to the defendant the amount of the award, less, first, a proper proportion thereof due to the amount of the insurance by two of the companies who have settled outside with Mr. Landau, and second, the amount of the complainants' cost to be taxed.