Windsor was a joint adventurer with Bowne and Mertz in the ownership of a large factory building on Washington street, Newark, for seven years, when he bought their interests, and five days later sold the factory to a tenant at a profit in excess of $50,000. The charge is, that at the time *Page 416 
Windsor bought his associates' shares the tenant was a prospective purchaser, negotiating with him and that he concealed the fact from them. The relation of joint adventurers, like that of co-partners, is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits. 15 R.C.L. 500, seq.; Gilbert andO'Callighan v. Anderson, 73 N.J. Eq. 243; Jackson v. Hooper,76 N.J. Eq. 185. The venture, undertaken in 1922, was not promising up to the time the three met on January 3d 1929, to apportion among them the proceeds of an $80,000 mortgage effected on the factory. They differed over whether the money was divisible equally or proportionally and whether according to the terms of an agreement to divide upon a sale Windsor, whose investment was largest, held to the proportional view, and he was right. The dispute had continued for three days and with acrimony, terminating in a sale of the property to Windsor, which yielded Bowne $30,000 and Mertz $14,000, leaving both heavy losers. Years of disappointment, a gloomy outlook and at loggerheads over the division of the mortgage money influenced the sale. Who suggested it is not clear, but Bowne made the first offer to buy at $115,000. Windsor made a counter offer, the one eventually agreed upon. He is pictured as eager to buy, yet at one stage in the negotiations and in an apparent spirit of fairness, he offered to draw slips from a hat to decide to which one of them should fall the lot of taking over the property, but on what terms does not appear; and at other times he was urged to take it over as the logical purchaser and was reluctant. The seemingly conflicting testimony of what happened during the three days of wrangling is reconcilable only on the theory that the hostile parties gave self-favoring phases of everchanging and conflicting events in a prolonged struggle, and leaves the mind neutral on the point for which it was offered, that Windsor's conduct reflected accomplishment of the secret dealings charged to him. It is of slight significance and of little guidance on the question of double-dealing, for if Windsor's motives were upright his conduct was consistent, while it there was over-reaching, a pretense *Page 417 
of eagerness to sell instead of buying would have been but subtle subterfuge. The interesting thing is what happened before: No sooner had he the title than Windsor addressed himself to the bookkeeper of the tenant, saying that he had bought the Bowne and Mertz interests and that he was the sole owner of the property and "I wonder if we cannot make some kind of a proposition to Mr. Stockman," meaning the president of the Delagrave Company, the tenant, and commissioned him to offer to his employer the property for $175,000. The same day, he says, the bookkeeper "rushed in" with an offer of $140,000, which he met by a counter offer of $165,000, and at that figure the deal was made within the next day or two. Was this fortuitous? The price was for the land on which the factory stood and a twenty-five foot strip adjoining. Ten days later the remaining seventy-five feet of land was included in the sale at $35,000. Windsor admits that, in August preceding, he had offered Stockman the building plot for $175,000, and the entire plot for $200,000, and upon pressing him with, "why don't you take it?" that Stockman shrugged his shoulder, and that later, in September, he spoke to him again and was met with an argument that "he wanted to be all under one place, that he wanted to be close together where he could oversee everything." The factory was just such a place. Stockman says there was much more to it than the shrug of his shoulder and the argument. It was in October, maybe November or December, he says, that Windsor broached the subject, suggesting that he take the factory rather than build, as Stockman had contemplated, and on the plans of which Windsor was a bidder. Stockman says he had made up his mind that it was what he wanted and that he and Windsor had agreed that it was a suitable place for his works and he had installed $150,000 worth of machinery. Only the factory was considered and the price was $165,000. Stockman held back; it was too high; he had in mind $140,000 and thinks he mentioned it, but is not confident and would not affirm that he had, and he is sure that he did not "come right out" with an offer, but that he told Windsor or let him understand *Page 418 
that he would buy. He says he had agreed (in his own mind) to pay the price, but hadn't positively agreed to buy, and that the matter lay that way for sometime; that when Windsor let him know that he was the owner and ready to sell, the price was not questioned, for he knew that. Apparently the only thing open was the question of joint use of the twenty-five foot strip and that was solved by Stockman's lawyer who advised the purchase of the whole plot to avoid future complications. Proof of the pre-arrangements do not rest with Stockman alone. Windsor asked Sandmeyer, lawyer to the adventure, how he thought matters could be arranged under the new financing (meaning the $80,000 mortgage) if he took title, and being asked, and denying, if he had a buyer, was told that if he had he would have to account for the profits. It may be significant that this lawyer was not the one who attended to the closing of the title to Stockman. J.B. Johnson Company, tenant of part of the building, had an option to purchase, which had seven or eight months to run. While negotiations were under way with Stockman, Windsor inquired of Mr. Elder, the local manager, if the company was going to exercise the option; that he had a prospective purchaser, the Delagrave Company. And he made the same inquiry of Mr. Johnson, the president, who said he learned from him that the Delagrave Company was a prospective purchaser.
Windsor claims to have told his associates of his efforts with the Delagrave concern. If he made mention, he did not tell all and truthfully, for he told Bowne and Mertz he couldn't get a whimper out of them, and that was not true.
Stockman is attacked as a blackmailer and perjurer. And as to Elder and Johnson, it is contended that they are confused as to the time they learned that the Delagrave Company was a prospect, and that they are prejudiced. Neither has any interest in the case; they were just witnesses, both of a superior type. The contention is that Elder and Johnson first heard of the Delagrave Company as a prospective purchaser at a conference called in January or February, 1929, to discuss the release of the option. Both had mental note of that *Page 419 
conference fixed upon them by the cross-examiner, but they persisted that the time was in the fall of the year before, Johnson identifying it with a talk he had with Windsor after they started heating the building, in October. Windsor had charge of the building.
Now, as to Stockman: He, upon being informed that Mertz had said to one of his employes that he, Stockman, had been overcharged and that if he could see his way clear to play along with him, at least $10,000 would be paid back and in addition, $1,500 which had been paid by a former tenant to restore an elevator to proper working order, went to Mr. Heine (complainant's lawyer) to learn the reason for Mertz' statement and what it meant. Bowne and Mertz agreed to repay the $1,500. He agreed to tell what he knew, and promised to reduce it to writing and he did, later, in his own handwriting, reciting as well, in detail, the Mertz episode of $10,000 and the promise of $1,500, and gave it to Mr. Heine. He also sent a copy of it to Windsor's lawyer and for this he is assailed as a blackmailer. The charge of blackmail is exploded — Windsor's lawyer asked for a copy of the statement. It was his idea of being fair to both sides in a nasty mess in which he wanted no part or at least wanted to stand indifferent if he should become involved; and this attitude is emphasized by the recital in the statement of his advent into the controversy. He evidently did not want to be compromised, and told the whole story. His demeanor on the stand was that of a conscientious witness, mindful of his oath, anxious to speak the truth in a trying situation. The promise of $1,500 was an incident; hardly a temptation to one of his means and with such heavy investments as he had in the factory. That alone is a voucher.
Stockman's testimony, that he was in negotiation with Windsor to purchase the factory in October, is charged to be untruthful because at that time he had under way plans for the building of a factory on another site on which Windsor was a bidder. He says the notion was abandoned as far back as August, because the bids were excessive. It is in evidence that Windsor modified the plans for lower bids; *Page 420 
that they were received November 12th, and still being too high further modification was in progress up to the time when Windsor was suddenly seized with the idea that Stockman might be interested in his factory, so unexpectedly acquired. There is nothing inconsistent in Stockman's mental processes. He was unsettled. The bids in August were forbidding and if there were others in November they were not as attractive as Windsor's meanwhile price for the factory, and the factory appealed to him. Add to this Windsor's persuasion to buy and not to build, his humor was to purchase, and Windsor sensed it.
There can be hardly a doubt that the Delagrave Company was in the market not only as a potential but a probable purchaser, waiting further overtures that were held in abeyance by Windsor. This is proved almost to the point of demonstration. Had Windsor's message gone to Stockman four days before instead of four days after January 3d 1929, the response, in all likelihood, would have been the same and the profits would have gone where the court must now direct Mr. Windsor to put them.
There will be an accounting. *Page 421