## State Auto. Mut. Ins. Co. v. Cox.

February 22, 1949.

Waller, Threlkeld & Whitlow for appellant.

Prince and Acree for appellee.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

On January 25, 1947, appellant issued to appellee an insurance policy covering a 1946 Chevrolet sedan which the latter had purchased from a dealer a month before. In addition to the liability and property damage, which are not involved here, the policy covered loss by theft, the limit of liability as to theft being the "actual cash value" of the automobile and expenses incurred in the hire and use of a substitute car not exceeding $150. About six months later the car was stolen from the garage of appellee and the parties being unable to agree on the value of the stolen car, this suit followed. Appellee claimed the value of the car at the time it was stolen was $2100; that he had hired a substitute automobile 16 days at $5.00 per day, plus $2.12 expended for bus fare, making a total of $218.12, the amount prayed for in the petition. Appellant admitted liability for theft of the car, but denied liability for any sum in excess of $1398.93, the cost of the car when it was purchased from the dealer in December 1946 plus $82.12 expenses claimed, and offered to confess judgment in the sum of $1481.05. On trial of the case the jury brought in a

verdict for appellee in the sum of $2082.12, and this appeal is from a judgment based on that verdict.

### The Question Involved.

The sole question involved in this appeal is this: What was the "actual cash value" of the automobile under the terms of the policy? Was it limited to the dealer's retail price, which appellee paid for the car, as contended by appellant, or was it the price the car would bring in the used car market, as contended by appellee?

This question was brought directly into this case when the judge of the lower court sustained appellee's motion to strike from appellant's answer a paragraph which pleaded that appellee's car had been purchased from a regular dealer at the regular retail price of $1398.93 and that the policy had been issued and the premium calculated on the basis of that price, which sum represented its actual cash value, which would depreciate throughout its life.

With this defense striken out, appellant declined to introduce any proof but moved for a peremptory instruction at the conclusion of appellee's proof, which motion was overruled, and the case was submitted to the jury with the result heretofore indicated.

The exact question involved in this appeal has not heretofore been before this court nor have we been cited to any decision in any other jurisdiction which decides the question. The phrase "actual cash value" has been defined in many cases. In 1 Bouvier's Law Dictionary, Rawle's Third Revision, it is thus defined: "In Insurance. The term means the sum of money the insured goods would have brought for cash, at the market price, at the time when, and place where, they were destroyed by fire." (Or stolen as in the case at bar.) In the case of Sun Insurance Office v. Rupp, D.C. Mo., 64 F.Supp. 533, 537, it is said:

"Having determined that insured is entitled to recover the actual cash value of the insured equipment, the question is how to arrive at the actual cash value. The courts have construed such a provision of an insurance policy many times, and I think there is no dispute but that the general rule is that laid down in Mack

& Co. v. Lancashire Ins. Co. et al., C.C., 4 F. 59, in which the court said:

" 'In such case the term "actual cash value" means the sum of money the insured goods would have brought for cash, at the market price, at the time when, and place where, they were destroyed.'

"This rule is supported by many decisions. Vol. 2 Words and Phrases, Perm. Ed., pages 221, 222.

"In Ohio Casualty Co. v. Stewart, Tex. Civ.App., 76 S.W.2d 873, 874, 878, the court said:

" ' "Actual cash value" of property is price it will bring in fair market after fair reasonable efforts to find purchaser who will pay highest price, or fair or reasonable cash price for which property can be sold in market, * * *.' "

It is a matter of common knowledge that there has been a vast change in the marketing and the market value of automobiles within the past decade. Prior to our entry into the late war a new car was always available and could be bought from the dealer's floor, when wanted, at the list price plus certain fixed charges. When this sum was paid, it represented and fixed the top price for that car, which price would never be higher. When the purchaser drove the car around the block it became a "used car" with some depreciation in value and it would never again bring a new car price, even though not hurt in the slightest, because a prospective purchaser could always go to the dealer and buy a new one off the floor at the same price. With our entry into war the picture changed. Only a limited amount of scarce materials could be allocated to the manufacture of pleasure automobiles and those which were made were strictly rationed and the price thereof fixed. This created such a tremendous demand for used cars that even these were brought under price control. By the end of the war the manufacture of new cars had been reduced to a trickle and thousands of used cars had worn out and been junked. When all controls were released and the manufacture of new cars began again in 1946, there was a tremendous accumulated demand for cars and only a limited production to meet it due to the scarcity of steel and other materials and the new increased cost of labor.

This resulted in an unprecedented situation in which a used car, which could be bought in the market, sold for more than a new car in a dealer's hands which could not be obtained except by a long wait on a dealer's preferred list. It is also a matter of common knowledge that many dealers refused to sell a new car unless there was a trade-in of a used car, which used car was taken in at less than its real value and sold in the unrestricted market at a price higher than had been allowed a purchaser of a new car on a trade-in. This profit, which a dealer made on an old car, was just as much a part of the sale price of the new car as was the cash he received, and was used by many dealers as a method of obtaining higher prices for new cars than could have been charged under the restrictions imposed upon them by the manufacturer. An interesting development in automobile prices was that whereas before the war a drive around the block depreciated the value of the new car, after the war this drive around the block actually appreciated its value because it then became a used car and was freed from the price restraints imposed on the dealer by the manufacturer. The result of all this was a tremendous boost in the market value of used cars under the old law of supply and demand and it is a matter of common knowledge that many slightly used cars sold for up to twice the dealer's retail price of new cars.

Did not this condition then fix the "actual cash value" of appellee's car? Assuming that he had to go into the market to buy a car for his immediate use to replace the stolen car, was not the inflated market price the price he would have had to pay rather than some theoretical price at which he might have obtained a car when, as and if, he could have obtained one from a dealer at some unknown distant date? We think the answers to these questions must be in the affirmative. We think the words "actual cash value," as used in the policy, had the same meaning in the automobile market at the time and under the conditions then existing as they would have had with reference to any other commodity. This has been defined by this court as the price which an article will bring when offered for sale by one who desires to sell, but is not compelled to do so, and is bought by one who desires to buy, but is not compelled to do so. Travelers Indemnity Co. v. B. & B. Ice & Coal Co.,

248 Ky. 443, 58 S.W.2d 640. Under this theory, it was appellee's duty to establish the cash value of the stolen car by evidence. This he did by the uncontradicted testimony of experienced automobile men who knew this particular car and who testified that at the time it was stolen, it had a market value of from $2000 to $2200, some placing it at the former and some at the latter figure. No evidence was introduced by appellant to contradict these figures and the jury fixed the value at the lowest figure plus other costs that were not questioned.

It may be true, as contended by appellant, that the form of the policy of insurance involved in this case was developed and used during the period when the greatest value of an automobile was the price it cost when new and that was the ultimate limit of its liability and the value upon which its premium rate was fixed. However, it is shown by the copy of the policy filed as an exhibit that the vital words "actual cash value" were not part of a printed form but were written in the blank space on the policy at the time it was issued in January 1947. The changed conditions in the automobile market, which we have heretofore described, were in existence at that time and were no doubt well known by appellant. How easy it would have been to have written into the policy prepared by appellant the few necessary words which would have limited its liability to the price paid by the insured for the car. Having chosen instead to use the words "actual cash value," it must be bound by those words and their meaning under conditions prevailing at the time the loss occurred.

Since we are of the opinion that the judgment of the lower court is based upon a correct interpretation of the law as applied to the insurance policy involved, it is hereby affirmed.

Judgment affirmed.