143 N.J. Super. 195 (1976)
362 A.2d 1236
GILFORD TITUS, PLAINTIFF,
v.
WEST AMERICAN INSURANCE COMPANY, A CORPORATION OF THE STATE OF CALIFORNIA, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 18, 1976.
*197 Mr. Robert I. Kuchinsky for plaintiff.
*198 Mr. John J. O'Donnell for defendant (Messrs. O'Donnell, Leary & D'Ambrosio, attorneys).
BEETEL, J.C.C., Temporarily Assigned.
This is an action for breach of an automobile insurance contract which raises the novel question of the insurer's liability for the theft of a used automobile in "customized" or "restored" condition.
Plaintiff filed suit seeking judgment in the amount of $2,000, together with interest and costs of suit, alleging that this amount represents the "actual cash value" (ACV) of plaintiff's automobile at the time it was stolen. Alternatively, plaintiff sought the appointment of a disinterested and competent umpire under Section 10, Part 3, of the insurance contract, which provides:
If the insured and the company fail to agree as to the amount of loss, either may, within 60 days after proof of loss is filed, demand an appraisal of the loss. In such event the insured and the company shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall state separately the actual cash value and the amount of loss and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of loss. The insured and the company shall each pay his chosen appraiser and shall bear equally the other expenses of appraisal and umpire.
The matter was pretried on June 5, 1975, and this court directed both sides to produce their appraisers in court on June 13, 1975, at which time the two appraisers would select the umpire. When defendant failed to produce its appraiser on the day set, the court ordered that Anthony Berezny of Sunset Tire Service, Inc., Route 12, Baptistown, New Jersey, be appointed the umpire for the purposes of making an award and determining the actual cash value of the automobile in question.
After some delay and a further order of this court, Berezny and the appraisers met and agreed that the market value of plaintiff's particular car at the time of the theft *199 was $2,000. However, they also agreed that the value of a vehicle of the same model and year in excellent condition, equipped with standard options, would be worth no more than $1,000. Neither of them knew which value was applicable under the law.
Thereafter plaintiff's motion for summary judgment was denied and the matter proceeded to trial before the court on April 29, 1976. Defendant withdrew its jury demand and admitted liability. The case was then heard before the court without a jury, limited to the issue of damages.
Plaintiff is a young man who operates his own auto body repair shop and who has been an auto body mechanic all his working life. On March 16, 1972 he purchased a used 1966 Mustang convertible for a purchase price of $472.50 (including $22.50 in sales tax). About three weeks later he contacted his insurance broker, Robert Herdman, and requested that this vehicle be added to his current insurance policy underwritten by defendant. At this time he wanted only coverage for liability.
Plaintiff purchased this car with the idea of "customizing" it. He enjoys working with automobiles and wanted to make his 1966 Mustang something special. To this end he did extensive work on the automobile. During the first seven months he owned the car he repainted it, added new tires, installed a new canvas top and added several other small items to the automobile. Evidence was submitted by plaintiff showing that during these seven months he spent approximately $350 on parts alone, exclusive of his own labor.
In September 1972 he contacted his insurance broker again and requested that "comprehensive" (theft and property damage) coverage be added to his policy. The broker, Herdman, testified that when this coverage was added plaintiff never mentioned to him that the car was in the process of being extensively remodeled or customized. Herdman admitted that he knew from casual observation that plaintiff's car had been repainted and that new tires had been added, *200 but he stated that this alone gave him no cause to suspect that the car was being customized or that these changes represented any increase in the insurable risk. The broker duly purchased this additional coverage at a cost of $9.18 a year.
Thereafter, plaintiff continued to improve and customize his vehicle. In March 1973 he rebuilt the engine at a cost of $156.10 (including labor). In May 1973 he purchased a second set of tires and a set of "mag wheels" at a total cost of $293.52 (including wheel locks). He also spent nearly $450 on other parts and equipment. During this time his automobile insurance policy was automatically renewed semi-annually. At no time did plaintiff inform the company or his broker of the extensive modification he made on the automobile.
On February 23, 1974 plaintiff's automobile was stolen. To this date it has not been returned. Shortly thereafter plaintiff filed a claim with defendant insurance company giving a description of the car and indicating that the odometer read 89,000 miles at the time of the theft. Lengthy negotiations ensued which resulted in the instant suit and the failure of the appraisers and the umpire to agree upon the standard upon which value should be determined.
At trial each side adduced expert testimony regarding the question of value and the method of evaluating auto insurance losses. Like the court-appointed umpire and defendant's appraiser, these experts were in substantial agreement regarding the market value of plaintiff's customized 1966 Mustang convertible. Among afficianados of such vehicles, plaintiff's car would have sold for $2,000 on the date of the theft. Plaintiff introduced pictures of his late beloved vehicle into evidence, and from viewing these photos this court finds that there is no question that the car was in excellent, indeed "cream puff," condition. Thus, this court finds as a fact that the market value of plaintiff's car, with the special equipment he added, was $2,000 on February 23, 1974.
*201 The experts could not agree on the value of a 1966 Mustang convertible with full standard options in excellent condition. Defendant's expert, an appraiser with many years of experience, testified that the "book value" of such a car was $375. "Book value," he explained, refers to two publications used throughout the auto and insurance industries to evaluate used automobiles, the Red Book published by National Market Reports, Inc., and the N.A.D.A. Official Used Car Guide published by the National Automobile Dealers' Association. He testified, further, that the maximum value of such a vehicle would be double the "book" price, or $750. Plaintiff's experts testified that such a vehicle would have sold for about $1,000. They rejected the book value method of evaluation as the only guide toward the determination of actual cash value. Berezny, the umpire, agreed with plaintiff's experts and thus iterated his previous findings made during arbitration.
If this court were to make independent findings of fact on this issue, it might place the value of a fully equipped, "cream puff" 1966 Mustang convertible at something closer to the double book value standard espoused by defendant's expert. However, for the reasons which follow, this court finds that $1,000 was the actual cash value of such a vehicle on the date of the theft under the terms of the insurance contract in question.
Although this case raises issues which have not been previously determined in this State (nor, it seems, in any other jurisdiction), there are some fundamental principles of law which apply.
An insurance policy covering the loss of * * * a motor vehicle specifies the limits of liability contracted for by the insurer and the insured, and such provisions, if not unreasonable or contrary to public policy, are controlling as to the extent to which the insurer may be held liable under the policy. Ordinarily, upon the happening of a loss * * * covered by the policy, the liability of the insurer becomes a present contract obligation to pay the amount of loss * * * sustained, subject to any policy provisions concerning the manner of *202 determining the amount of such loss. [7 Am. Jur.2d, Automobile Insurance, § 189 at 528-529]
Further, it is fundamental that provisions of an insurance policy are construed strictly against the insurer, Matits v. Nationwide Mut. Ins. Co., 33 N.J. 488 (1961), and that any ambiguity in the terms of the policy is to be resolved in favor of the insured, Korfin v. Continental Cas. Co., 5 N.J. 154 (1950). It is also settled law that the value of an insured item which is stolen is determined as of the time and place of its taking. 22 Am. Jur.2d, Damages, § 147.
The insurance policy purchased by plaintiff from defendant limits the insured's liability in case of theft to "actual cash value." The pertinent paragraph of the policy states that:
The limit of the company's liability for loss shall not exceed the actual cash value of the property, or if the loss is a part thereof, the actual cash value of such part, at time of loss, nor what it would then cost to repair or replace the property or such part thereof with other of like kind and quality, nor, with respect to an owned automobile described in this policy, the applicable limit of liability stated in the declarations; provided, however, the limit of the company's liability (a) for loss to personal effects arising out of any one occurrence is $100, and (b) for loss to any trailer not owned by the named insured is $500.
As previously mentioned, the policy also provides for arbitration should ACV be disputed.
The policy does not define actual cash value, nor is there any reported decision in this State defining the term within the context of an automobile insurance contract. N.J.A.C. 11:3-10.2 defines the term as follows:
"Actual cash value", unless otherwise specifically defined by law or policy, means the lesser of the amounts for which the insured or the designated representative can reasonably be expected to:
1. Repair the motor vehicle to its condition immediately prior to the loss; or
2. Replace the motor vehicle with a substantially similar vehicle. Such amount shall include all monies paid or payable as sales taxes on the motor vehicle repaired or replaced. This shall not be construed *203 to prevent an insurer from issuing a policy where the amount of damages to be paid in the event of total loss is a specified dollar amount. * * *
"Substantially similar vehicle" means a vehicle of the same make, model, year and condition, including all major options of the insured vehicle. Mileage must not exceed that of the insured vehicle by more than 4,000 miles. Mileage differences of more than 4,000 miles may, at the option of the insured, be exchanged for the presence or absence of options or a cash adjustment.
Even if this section were controlling (it was made effective on May 1, 1976 and thus post-dates the controversy here), it provides little assistance in resolving the meaning of ACV.
In determining the meaning of actual cash value generally, there appears to be a split of authority. See Annotation, "Test or Criterion of `Actual Cash Value' under Insurance Policy Insuring to Extent of Actual Cash Value at Time of Loss," 61 ALR 2d 711. Some courts adopt a market value test; others look to a formula reflecting reproduction or replacement cost; others have adopted the so-called "broad evidence rule" under which any evidence is received which logically tends to establish actual cash value, and some courts have held that actual cash value is an independent test to be applied without reference to other criteria.
The three reported decisions which have applied New Jersey law to ACV are of little assistance since they do not deal with automobile insurance. In Bartindale v. Aetna Ins. Co., 7 N.J. Misc. 399, 145 A. 633 (Sup. Ct. 1929), the court assumed, without deciding, that actual cash value within the context of a stated value fire insurance policy covering a residential structure and its furnishings meant market value. In Thorp v. American Aviation & General Ins. Co., 212 F.2d 821 (3 Cir.1954), the court affirmed the charge of the trial judge applying the broad evidence rule to determine the meaning of actual cash value under the terms of a stated value fire insurance policy covering a movie theatre. The language of the charge had come from defendant's request to charge, and it was defendant who subsequently *204 took exception to his own requested language. Thus, the Circuit Court of Appeals did not decide whether the charge was correct, but affirmed the trial court for the reason that defendant could not have been prejudiced. In Messing v. Reliance Ins. Co., 77 N.J. Super. 531 (Law Div. 1962), the trial court adopted a "form of the broad evidence rule" to define the meaning of actual cash value within the terms of a stated value fire insurance policy covering a building.
Unrestrained by controlling precedent, this court is in the position to adopt what appears to be the better rule for determining the actual cash value of an automobile, and that is, its market value. See 15 Couch on Insurance 2d, § 54: 232; 7 Am. Jur.2d, Automobile Insurance, § 190; Annotation, supra, 61 ALR 2d 711, § 6. As these authorities point out, there is a readily determinable market value for used automobiles, and this value adequately compensates the insured and adequately reflects his reasonable expectations. The broad evidence rule, while helpful in indemnifying owners of property which might be unique or which, when sold on the market, would not bring a reasonable return (e.g., used furniture or clothing), is too uncertain a standard to be applied to the day-to-day business of adjusting automobile insurance claims.
This conclusion is buttressed by the testimony of the witnesses in this action. They all assumed that when you talk of value, you are talking about market value. They disagreed over whether the industry guidebooks were the only evidence of market value, but they agreed that market value governs.
Thus, this court holds that actual cash value means market value. This leads again to a familiar principle of law. Market value is "measured by the price which, in all probability, would voluntarily be agreed upon in fair negotiations between an owner willing (but not forced) to sell and a buyer willing (but not forced) to buy." State v. Gorga, 26 N.J. 113, 115 (1958).
*205 A related question, raised obliquely by the parties, is what evidence is admissible to prove market value. The insurer contends that the evidence is limited to the guidebooks used by its adjusters. The insured claims that, by analogy to the broad evidence rule previously discussed, all evidence tending to prove market value is admissible. Whatever merits each argument has, see N.J.A.C. 11:3-10 and Darvie v. American Bankers Ins. Co., 80 So.2d 541 (La. App. 1955), the issue need not be resolved since the policy itself supplies the answer. The arbitration provision in § 10 of the contract provides a mechanism for determining disputed evidence. "Competent appraisers," who presumably will have broad experience in the used automobile market, can best judge the market value of an automobile. So long as their award is not fraudulent, evidently partial, a product of misconduct, or in excess of their powers, as here, their findings will not be disturbed. N.J.S.A. 2A: 24-8.
The final question to be resolved is what automobile is to be evaluated. Plaintiff argues strenuously that it is his car, as he had equipped it, which should be the subject matter of the evaluation. Defendant argues with equal intensity that the subject matter of the evaluation is an automobile of the same model, year and condition, equipped with standard options. Surprisingly, research has disclosed no case directly on point, nor do the commentators provide significant enlightenment.
Defendant insurer presented uncontradicted expert testimony by an experienced insurance underwriter regarding long-established industry custom and usage. He stated that comprehensive coverage is geared to insure the ordinarily equipped automobile and that this was widely known and employed by all insurers. He further opined that the insurance buying public is aware of this custom, and that the extremely modest premiums payable for such coverage should, at a minimum, put the insured on notice that what was being insured was an ordinary risk.
*206 Testimony was also adduced regarding the manner in which comprehensive coverage is purchased. The potential insured contacts his insurance broker or agent and is then asked to provide certain information  the make, model, year and serial number of the car; whether standard optional equipment is present or absent, e.g., automatic transmission, "power options," air conditioning, etc. The broker then consults standard industry manuals to determine the applicable premium. This is based upon the average market value of a similarly equipped motor vehicle of the same model and year.
Based on this testimony defendant argues that the subject matter of this policy was a "1966 Mustang with standard options," not a "customized 1966 Mustang with a rebuilt high-powered engine, mag wheels, racing tires, a front sloping chassis, and special paint." To point to the logical absurdity of plaintiff's position, counsel for defendant advanced a "horrible hypothetical"  a solid gold 1966 Mustang with mink seat-covers studded with precious gems. Surely, he urges, such a vehicle could not be insured at full value for the paltry sum of $9.18 a year.
Defendant's logically extreme example is compelling. It would be patently unreasonable for the owner of such a vehicle to expect full coverage in case of loss. Plaintiff's vehicle is not, however, positioned at this extreme. Surely, an owner who maintains his car in excellent condition by regular servicing and the replacement of worn parts can reasonably expect to be covered for the full value of his automobile. In fact, by providing for arbitration in its policy, the insurer recognizes that individual automobiles of the same model year do vary in value, and thus makes allowance for these legitimate expectations. This plaintiff, however, did something more than merely maintain his car in excellent condition. He added equipment which did more than make the vehicle safe and convenient, and more than was necessary to make it a running car. Shapiro v. Security Ins. Co., 256 Mass. 358, 152 N.E. 370 (Sup. Jud. *207 Ct. 1926). It is undisputed that the special improvements placed on the vehicle more than doubled its value. Thus, plaintiff could not reasonably expect to receive full value for the edition of nonessential and nonstandard equipment.
In response to this, plaintiff cites State Auto. Mut. Ins. Co. v. Cox, 309 Ky. 480, 218 S.W.2d 46 (Ct. App. 1949). In that case the insured purchased a new 1946 automobile for $1,398.93. Six months later the car was stolen. His policy insured the vehicle for "actual cash value." At trial the insured presented evidence that the car had a market value of $2,100 on the date of the theft. The inflated value was produced by the post-World War II shortage of automobiles. The court found in favor of the insured despite the fact that the insurance premium was calculated upon the purchase price of the car.
Cox is not dispositive. The increased risk was caused by market conditions, not by any unanticipated alterations of the vehicle by the insured. Insurance companies are expected to absorb, either by way of profit or loss, the economic fluctuations of the market place. This is an accepted risk of doing business.
Plaintiff also urges that notwithstanding the fact that modified vehicles may not be within the ambit of the insurable risk, the insurer is in a position to protect itself by asking the potential insured whether or not his vehicle is other than an ordinary one. In essence, plaintiff argues that the insurer has a duty to ask the insured the "magic question," and failing this, the insured may safely not disclose facts relevant to the risk. Reliance is placed upon the rule of law found in Harr v. Allstate Insurance, 54 N.J. 287 (1969):
Average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; * * * it is the insurer's burden to obtain * * * all information pertinent to the risk and the desired coverage before the contract is issued. * * * [at 304]
*208 This argument is not without merit. Assuming that the average purchaser of auto insurance reasonably expects that if his vehicle is customized he need not bring this to the attention of his carrier unless asked, then there might be a duty imposed on the insurer to obtain information relevant to this risk. However, defendant disputes the basic assumption upon which such a duty is premised. First, its experts asserted that the average consumer has no such justifiable and reasonable expectation; and second, that this particular plaintiff, an auto body mechanic with, at a bare minimum, peripheral involvement with claims adjustment, should have known the universal practice and custom within the insurance industry  that customized vehicles must be insured under a stated value policy.
This court need not decide whether to impose a duty on the insurance company to make inquiries in the case of an average consumer, because it is apparent that this plaintiff is not an average consumer. Given the undisputed testimony that it was clearly not the practice of the insurance industry to make inquiries regarding present or future modifications of the insured vehicle, the fact that this practice was sufficiently notorious in the trade to have put this insured plaintiff on notice and the fact that the plaintiff was in the best position to know the extent of the additional risk he was creating, plaintiff's claim for an additional $1,000 in damages must be denied. See Public Service Mut. Ins. Co. v. White, 4 N.J. Super. 523, 527 (App. Div. 1949). It is clear that the increased value sought is attributable to parts which were not needed to make the car a working vehicle, but to parts designed to make the automobile more aesthetically pleasing. ACV coverage is not designed to insure such value.
The situation presented here may also be analogized to the long-recognized rule of law that:
A misstatement or false declaration in the application or policy with respect to the description of the character of the insured vehicle may, if material to the risk, constitute a sufficient ground for avoidance or forfeiture of the policy, without regard to whether the *209 misdescription was made intentionally or in good faith. [7 Blashfield's Automobile Law and Practice (3 ed.), § 302.1 at 331-332]
See also, Newall v. Aetna Ins. Co., 99 N.J.L. 287 (E. & A. 1923); Felakos v. Aetna Ins. Co., 119 A. 277 (N.J. Sup. Ct. 1922); 7 Am. Jur.2d, Automobile Insurance § 17. Although this rule is not favored in this State, see, e.g., Merchants Indem. Corp. v. Eggleston, 37 N.J. 114 (1962), it does demonstrate the law's recognition of the actuarial consequences flowing from a proper or improper representation as to the identity of the risk to be insured. Here, plaintiff represented that his car was a "1966 Mustang convertible" when in fact it was (or became) a "customized 1966 Mustang convertible." Such a misstatement was certainly "material to the risk," since it both increased the potential liability of the insurer and the likelihood that the vehicle might be purloined. Had not defendant graciously admitted liability, it may well have been able to advance the argument that the policy should have been avoided on this ground.
There also exists another reason why plaintiff's claim for an additional $1,000 must be denied. In Boston Ins. Co. v. Wade, 203 Miss. 469, 35 So.2d 523 (Sup. Ct. 1948), the insured purchased a collision policy on a certain truck. After the policy had been issued a wooden body was added to the truck, and this fact was not conveyed to the carrier. The court held that the increased value attributable to the installation of the wooden body could not be used in determining the amount recoverable under the policy. Similarly, in Moore v. American Ins. Co., 81 Ga. App. 219, 58 S.E.2d 197 (App. Ct. 1950), the court denied the insured's claim for additional coverage where he had added a $4,000 concrete mixer to his vehicle after the insurance policy had been issued.
In the instant case most of the modifications to the vehicle were made after plaintiff met with his broker and purchased the comprehensive coverage. These subsequent modifications (the rebuilt engine, the racing tires, and the *210 mag wheels) were primarily responsible for the doubling of the car's market value.
For the reasons stated above, this court finds in favor of plaintiff in the amount of $1,000 plus taxed costs and interest. Because of the novel questions of law involved and defendant's lack of bad faith, taxed costs shall not include an award of counsel fees. R. 4:42-9(a) (6); Felicetta v. Commercial Union Ins. Co., 117 N.J. Super. 524 (App. Div. 1971). Interest shall not commence until the entry of the judgment. R. 4:42-11(a).