270 N.J. Super. 143 (1993)
636 A.2d 599
EUGENE HELLER, INDIVIDUALLY AND AS TRUSTEE FOR THE BENEFIT OF BONNI S. HELLER AND TODD A. HELLER, PLAINTIFF,
v.
HARTZ MOUNTAIN INDUSTRIES, INC., AND LEONARD N. STERN, DEFENDANTS. HARTZ MOUNTAIN INDUSTRIES, INC., PLAINTIFF,
v.
EUGENE HELLER, INDIVIDUALLY AND AS TRUSTEE FOR THE BENEFIT OF BONNI S. HELLER AND TODD A. HELLER, DEFENDANT.
Superior Court of New Jersey, Law Division Hudson County.
Decided August 27, 1993.
*145 Laurence B. Orloff for plaintiff/defendant Heller (Orloff, Lowenbach, Stifelman & Siegel, and Kramer, Levin, Naftalis, Nessen, Kamin & Frankel (of the New York bar), attorneys; Mr. Orloff, Arthur H. Aufses, III, and Richard M. Molot, on the brief).
David I. Goldblatt for plaintiff Hartz Mountain and defendants Stern and Hartz Mountain (Proskauer, Rose, Goetz & Mendelsohn (of the New York bar) and DeCotiis & Pinto, attorneys; Mr. Goldblatt and Sheila M. Gowan, on the brief).
*146 D'ITALIA, J.S.C.
This matter is before the court on cross-motions for summary judgment. The motions present significant questions regarding the applicability of fiduciary standards to a partner managing the buyout of a co-partner and the standards of impartiality to which party-designated appraisers should be held.
These consolidated actions arise out of plaintiff Eugene Heller's ("Heller") withdrawal from various partnerships in which he was associated with defendant Hartz Mountain Industries, Inc. ("Hartz"). Much of the factual background of these matters is undisputed.
Hartz is a New York corporation maintaining its principal place of business in Secaucus, New Jersey. It is engaged in the business of owning, developing and managing commercial real estate located primarily in northern New Jersey. Defendant Stern serves as the Chairman of the Board of Hartz.
Heller joined Hartz in the mid 1960's. Early on, Stern and Heller agreed that Heller would be a ten-percent participant in all of Hartz's real estate investments, which were being developed in partnership form, with Hartz as the managing partner and key Hartz executives as participants. From approximately 1977 until his resignation in 1991, Heller served as President of Hartz and was responsible for the development and management of Hartz's portfolio of real estate development projects. Heller estimates the market value of Hartz's portfolio at nearly two billion dollars.
By 1981, Heller had acquired a partnership interest in approximately sixteen Hartz partnerships, which collectively owned and managed a minimum of eighty-five properties.[1] Each partnership was subject to a written partnership agreement. Each agreement *147 provides for the withdrawal of partners and a method for determining the purchase price of a withdrawing partner's interest.
On June 25, 1991, Heller advised Hartz that he was resigning all of his partnership interests. Under the terms of the partnership and related agreements, this notice imposed a duty on Hartz to procure appraisals to determine the value of Heller's interests. Each of the partnership agreements provides that either the partnership or Hartz, as managing general partner, must purchase a withdrawing partner's interest.
The sixteen partnerships at issue can be grouped into two categories according to the procedures by which the withdrawing partner's interest is to be determined. Nine partnerships have been characterized as "single appraiser" partnerships. These single appraiser partnerships require the parties initially to negotiate the value of partnership properties.[2] If the parties cannot reach an accord, the partnership agreements provide that value shall be determined by one appraiser, who is to be selected by the general partner. The remaining seven partnerships require the general and withdrawing partner to jointly select a single appraiser. If they are unable to agree on a single appraiser, however, then each is to select one appraiser, and those appraisers must select a third. All sixteen partnership agreements provide that the value determined by appraisal "shall be binding and conclusive" on the parties.
On November 5, 1991, Hartz informed Heller that it had selected Robert J. DiFalco of Cushman & Wakefield of New Jersey ("C & W") to determine the appraised value of the real estate in the single appraiser partnerships. DiFalco is a director and manager of C & W, a wholly owned subsidiary of Cushman & Wakefield, Inc., which is a national firm of real estate brokers and appraisers. By letter dated December 4, 1991, Heller advised *148 Hartz that he objected to the appointment of DiFalco. On December 6, 1991, Hartz inquired as to the basis of Heller's objection. Heller elected not to respond.
On February 4, 1992, Hartz filed a declaratory judgment action seeking a determination that its engagement of DiFalco was consistent with the partnership agreements. Four days later, on February 8, 1992, Heller filed a separate action seeking to compel delivery of the DiFalco appraisals. These cases were consolidated on March 9, 1992.
The DiFalco appraisals were delivered to Heller on April 2, 1992. On April 27, 1992, Heller amended his complaint to challenge the substance of the DiFalco appraisals as "shockingly low." The amended complaint alleges that Hartz's internal valuations of the single appraiser properties as of March 1991 totalled $214,562,182, while DiFalco appraised these same properties as having a value of $133,230,000 as of October 31, 1991.
By this motion, Heller seeks partial summary judgment setting aside the DiFalco appraisals of his interest in the single appraiser partnership properties.[3] Heller contends that Hartz, as managing partner under the single appraiser partnership agreements, owed him a fiduciary obligation to manage the valuation and purchase of his partnership interests in the utmost good faith. Heller further contends that Hartz breached this duty by acting in a manner designed to compromise the independence of the appraiser and to influence the appraisal report. Heller also argues that the DiFalco appraisals are, in fact, tainted as a result of Hartz's actions and should not, therefore, be considered either binding or conclusive. Heller seeks to bar the use of these appraisals for any purpose in the valuation of his partnership interests.
Hartz has cross-moved for an order declaring its appointment of DiFalco to be consistent with any obligations owed to Heller and *149 for a determination that the appraisals are binding and conclusive. The cross-motions also seek a determination that DiFalco may serve as the Hartz-designated appraiser in connection with the three-appraiser partnerships.
It is well-settled that summary judgments are to be granted with extreme caution. Ruvolo v. American Cas. Co., 39 N.J. 490, 499, 189 A.2d 204 (1963). In deciding a motion for summary judgment, the court must determine whether or not a genuine issue of material fact exists. The burden is placed on the movant to exclude any reasonable doubt as to the existence of any genuine issue of material fact and all inferences of doubt are drawn against the moving party in favor of the opponent. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75, 110 A.2d 24 (1954). Only when it is found that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law should such a motion be granted.
Many of the issues projected by these motions would require the court to resolve a host of disputed factual matters. These disputed facts, and the variety of inferences which might be drawn from them, preclude the grant of summary judgment for either party on such issues as whether Hartz breached its duty to select a truly independent appraiser and whether Hartz's conduct inappropriately influenced the appraisal report which ultimately issued. Moreover, since the parties are contending in large measure over the presence or absence of good faith, the court would be obliged to determine what motivated Hartz to act as it did during the appraisal process. In such cases, the grant of summary judgment is problematic. As was said in Judson, where the subjective element of good faith is material to the claim of the movant or defense of the party moved against, "a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain." Judson, supra, 17 N.J. at 76, 110 A.2d 24.
Heller is, however, entitled to relief from the binding effect of the appraisals based on undisputed facts which support the conclusion *150 that Hartz breached its fiduciary duty to manage the buyout process in a fair manner. The court rejects Hartz's contention that the appraisals have presumed validity and should not be set aside except upon proof of fraud, mistake or bad faith under the authority of cases such as Elberon Bathing Co. v. Ambassador Ins. Co., 77 N.J. 1, 14-17, 389 A.2d 439 (1978), and Titus v. West American Ins. Co., 143 N.J. Super. 195, 205, 362 A.2d 1236 (Law Div. 1976).
Elberon Bathing Co. and Titus are insurance loss cases in which the insurance policy provides for appraisal as a mechanism for resolving disputes over value. In such cases, public policy discourages litigation over procedures which were designed to resolve disputes without litigation. Thus, as with arbitration, appraisal awards in insurance loss cases are accorded "every reasonable intendment" and a presumption of validity. Elberon, supra, 77 N.J. at 14, 389 A.2d 439; Melton Bros. v. Philadelphia Fire and Marine Ins. Co., 104 N.J. Eq. 153, 158, 144 A. 726 (E. & A. 1929). See also N.J.S.A. 2A:24-8. While the policy of encouraging parties to accept the results of contractually based private dispute resolution has general application, it must yield where, as here, the parties are in a fiduciary relation. The conduct of a fiduciary is always subject to scrutiny, unshielded by any presumptions which cast special burdens of proof on beneficiaries who seek to challenge that conduct.
Heller is not limited to challenging the appraisal report on the grounds of fraud, mistake or misconduct on the part of the appraiser. In the instant case, Hartz stands in a fiduciary relationship to Heller and plaintiff may properly focus on its conduct rather than solely that of the appraiser. If Hartz breached its fiduciary obligation and that breach had a clear capacity to taint the appraisal report, the report must be declared a nullity, despite the absence of direct evidence of actual taint. This result follows from the application of general principles of partnership law.
It is fundamental that "each partner stands in a fiduciary relationship to every other partner." Neustadter v. United Exposition *151 Service Co., 14 N.J. Super. 484, 493, 82 A.2d 476 (Ch.Div. 1951). The relationship is "one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits." Stark v. Reingold, 18 N.J. 251, 261, 113 A.2d 679 (1955) (quoting Bowne v. Windsor, 106 N.J. Eq. 415, 416, 151 A. 124 (Ch. 1930), aff'd, 108 N.J. Eq. 274, 154 A. 768 (E. & A. 1931)). See also Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 499, 144 A.2d 207 (App.Div. 1958). More significantly for the present case, where a managing partner controls the partnership's business, that partner is held to the "strictest possible obligation" to his or her co-partner since the affairs of all partners are delegated to the manager without interference or monitoring on the part of the non-managing partners. Silverstein v. Last, 156 N.J. Super. 145, 152, 383 A.2d 718 (App.Div. 1978).
The standard of behavior for fiduciaries is best articulated in the oft-quoted language of Justice Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928):
Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.
It is well-settled in other jurisdictions that partners are not relieved of their duties to act with the utmost good faith in their dealings with each other merely because relations between them become strained during the buyout process. Boswell v. Gillett, 226 Ark. 935, 295 S.W.2d 758 (1956); Karle v. Seder, 35 Wash.2d 542, 214 P.2d 684 (1950); Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786 (1938); Wright v. Duke, 36 N.Y.S. 853 (App.Div. 1895). Further, it is generally held that the fiduciary obligation remains until the relationship is terminated and partnership affairs are wound up. 59A Am.Jur.2d Partnership § 934 (1987); Meinhard *152 v. Salmon, supra; Fouchek v. Janicek, 190 Or. 251, 225 P.2d 783 (1950).
New Jersey courts have consistently recognized the fiduciary obligations of a managing partner in a buyout situation. In Gilbert & O'Callighan v. Anderson, 73 N.J. Eq. 243, 66 A. 926 (Ch. 1907), the court held that where a managing partner undertakes to purchase the interest of another partner, it is her or his duty "to make a full and complete disclosure of the condition of the business in every way essential to an adequate knowledge on the part of complainants [other partners] as to what they were selling, and the burden is upon the defendant to establish the fact that he performed his full duty in that respect." Ibid. In Konsuvo v. Netzke, 91 N.J. Super. 353, 220 A.2d 424 (Ch.Div. 1966), Judge Lora wrote that the demands of a fiduciary relationship "are especially pertinent and precise where one partner in exclusive control of the management of the firm's business assumes to purchase the interest of his co-partner." Id. at 368, 220 A.2d 424. See generally, M.C. Dransfield, Annotation, Duty in Respect of Good Faith and Disclosure of Information Upon Sale of Member's Interest in a Partnership Adventure to Other Member, 120 A.L.R. 724 (1939).
There may be instances where the interests of partners may diverge to such an extent that the fiduciary relation should be deemed terminated. That subject was addressed in a general way in Fravega v. Security S. & L. Ass'n, 192 N.J. Super. 213, 469 A.2d 531 (Ch.Div. 1983). There, Judge Gibson wrote:
Although a joint venturer, when acting within the scope of the common enterprise, admittedly has an obligation to act toward his coadventurers with utmost good faith, Stein v. George B. Spearin, Inc., 120 N.J. Eq. 169, 176 [184 A. 436] (Ch. 1936), that standard would not appear to logically extend to transactions where the relationship between the parties is, by nature, adversarial.
Whereas one may reasonably rely on the good faith and fair dealing of a partner or joint venturer in carrying out the common goals of the joint venture, the dissolution of that joint venture places the principals in a different light. In such a setting each may reasonably expect the other to seek a position which is in that person's best interest, and the elements of trust and reliance necessary to a fiduciary obligation would not be present. See Sind v. Pollin, 356 A.2d 653, 655 (D.C.App. 1976); 48A C.J.S. Joint Ventures § 24.

*153 On the other hand, to the extent that defendants may be found to have assumed the obligation to manage the disposition of the joint venture assets, then their actions may ultimately be judged by fiduciary standards.
[Id. 192 N.J. Super. at 223, 469 A.2d 531.]
In this court's view, a partner managing the buyout of a withdrawing former partner continues to have the burdens of a fiduciary, despite their diverging economic interests. Nothing short of complete candor and openness in matters related to the valuation of assets is required. This does not imply that the continued application of fiduciary standards precludes disagreement. It does not. It requires only that disagreement be resolved by punctilious attention to the demands of honesty, candor and fairness. Thus, an appraisal obtained by the partner managing the buyout of a former partner may be set aside where that appraisal is the product of a process which lacks openness or fundamental fairness.
In this case, Hartz managed the appraisal process to the total exclusion of Heller, so much so that the appraiser perceived that Hartz, and not the partnership, was his employer. Aside from identifying DiFalco as its designated appraiser, Hartz provided Heller with no information about the appraisal process. Neither Hartz nor the appraiser ever communicated further with Heller. Thus, Heller was not contemporaneously apprised of Hartz's turnover of economic data to the appraiser and hence was never given the opportunity to challenge or supplement that data. Further, Heller was not given notice of any meetings between Hartz and the appraiser and was therefore not privy to Hartz's various discussions about economic and other assumptions affecting value. DiFalco and his associate came to understand that Heller was not to be included in any discussions or communications and, as a result, neither of them ever made any effort to contact Heller to solicit his input.
Viewing the record in a light most favorable to Hartz, it is indisputable that C & W perceived itself as the agent of Hartz, as distinguished from the partnerships in which both Hartz and Heller had financial interests. It is also indisputable that Hartz's *154 conduct precipitated and sustained that inappropriate view. The appraiser's submittal of draft reports to Hartz's attorneys for review, comment and editing shatters any semblance of the fair treatment to which Heller is entitled.
The partnership agreements gave Hartz authority only to select an independent appraiser, not to control the process to the exclusion of Heller. The agreements are silent with respect to how the appraisal process should be conducted. However, in Elberon Bathing Co., supra, 77 N.J. at 17, 389 A.2d 439, the New Jersey Supreme Court said, "Appraisers act on their own skill and knowledge, need not be sworn and need hold no formal hearings so long as both sides are given an opportunity to state their positions." Further, appraisers may act on information received informally from third parties. Binkewitz v. Allstate Ins. Co., 222 N.J. Super. 501, 511, 537 A.2d 723 (App.Div. 1988); American Union Ins. Co. v. Stull Bros. Co., 126 N.J. Eq. 64, 65, 7 A.2d 866 (Ch.Div. 1939).
While these standards were articulated in cases dealing with appraisals conducted pursuant to statutes regulating fire insurance, N.J.S.A. 17:36-5.15 to -5.30, they are certainly applicable to appraisal proceedings designed to resolve disputes between parties, unless the parties specifically agree otherwise. In all cases, appraisers must, of course, be unbiased and disinterested. American Union Ins. Co., supra, 126 N.J. Eq. at 65, 7 A.2d 866; Code of Professional Ethics of the Appraisal Institute, Canon 3 (1990).[4]
Our concern in this case, however, is less with the conduct of the appraiser than with that of Hartz. Hartz had a duty to conduct itself in a manner which preserved both the actuality and appearance *155 of the appraiser's independence. To that end, ex parte communications should have been avoided. The appraiser should have been informed that his duty was to the partnership entities and not to any individual partner. The fact that Hartz is the managing partner should have given it no special advantage in the appraisal process beyond that inherent in its selection of the appraiser. Even in performing that selection function, in assuring that its designated appraiser would be competent and independent, Hartz was obliged to be scrupulous not to rend the fabric of impartiality with which the process must be cloaked.
The DiFalco appraisal must be set aside as the product of efforts by Hartz to control and influence its contents in breach of Hartz's fiduciary duty to Heller. However, the court declines to appoint its own appraiser. Hartz will have a renewed opportunity to select an independent appraiser pursuant to the terms of the single appraiser partnership agreements. The costs of the DiFalco appraisal shall be borne entirely by Hartz and not be an expense of the various partnerships.
Hartz's cross-motion seeks an adjudication that DiFalco be approved as the Hartz-selected appraiser for the three appraiser partnerships. Heller asks the court to disapprove DiFalco. The court finds that DiFalco has been so far compromised by his complete acquiescence to Hartz's efforts to exclude Heller from any participation in the single appraiser proceedings that his functioning as one of the three appraisers must be enjoined.
There are no doubt differences between the roles of an appraiser as the sole arbiter of value and as a party-selected appraiser serving as one of a panel of three. The precise differences need not be explored here. In an early case, it was said that an appraiser chosen by a party "is supposed and expected, in a restricted sense, to represent the party appointing him and within reasonable limits to see to it that no legitimate consideration favorable to the party so appointing him is overlooked by the other appraiser." American Central Ins. Co. v. Landau, 62 N.J. Eq. 73, 93, 49 A. 738 (Ch. 1901). The party-selected appraiser *156 must nonetheless be "disinterested," meaning impartial, unbiased, free from partisanship and able to do equal justice between the parties. 6 J.A. Appleman & J. Appleman, Insurance Law and Practice § 3927 (1972); Central Life Ins. Co. v. Aetna Cas. & Sur. Co., 466 N.W.2d 257, 261-62 (Iowa 1991) ("This agreement requires one of the appraisers and the umpire to jointly arrive at a decision. This places the appraiser in the position of decision-maker; thus, the function of the appraiser becomes quasi-judicial.... An inherent qualification for a quasi-judicial decision-maker is disinterest in the result.").
In Barcon Associates v. Tri-County Asphalt Corp., 86 N.J. 179, 430 A.2d 214 (1981), the New Jersey Supreme Court adopted the principle that party-designated arbitrators must, equally with a so-called "neutral" arbitrator, adhere to high standards of honesty, fairness and impartiality. Writing for the majority, Justice Pashman wrote:
While a party-designated arbitrator may approach the arbitration proceedings with some sympathy for the position of the party designating him, such an arbitrator must remain faithful to the obligation which rests upon him to maintain "broad public confidence in the integrity and fairness of the [arbitration] process." ... Thus, all arbitrators should "conduct the proceedings in an evenhanded manner and treat all parties with equality and fairness at all stages of the proceedings." ... Most important, arbitrators "should decide all matters justly, exercising independent judgment, and should not permit outside pressure to affect the decision."
[Id. at 190, 430 A.2d 214.]
This court is mindful of the fact that Barcon Associates deals with arbitrators, not appraisers, and bottoms its conclusions on certain elements of arbitration which do not necessarily attach to appraisals, the most significant of which is that arbitrators function with the support, encouragement and enforcement power of the State. N.J.S.A. 2A:24-1. Although appraisers do not perform their quasi-judicial functions in quite the same manner as arbitrators, there is nonetheless a compelling public interest in their determinations being made honestly, fairly, and impartially. If appraisals are to serve any legitimate function, they must, of necessity, be unbiased and impartial. A biased appraisal has no *157 honest commercial utility. Appraisals promote the private resolution of disputes, which is favored by the law. Appraisals tainted by partiality would disserve that policy. Moreover, the Code of Professional Ethics of the Appraisal Institute provides, in Canon 3, that "in the performance of an appraisal assignment a member ... must develop and communicate each analysis and opinion without bias for the client's interest and without accommodation of his or her own interests." Thus, there is no reason that the standards articulated by the Barcon Associates majority as governing the conduct of a party-designated arbitrator should not apply equally to a party-designated appraiser.
Appraisers who are subject to the direction or control of a party are, by definition, not qualified. Appleman & Appleman, supra, § 3927 at 547. In this case, DiFalco acted in a variety of instances in a manner more consistent with his being an agent of Hartz than an independent arbiter of value. The ex parte communications, the unilateral development of assumptions and the submission of a draft appraisal report to Hartz for editorial comment cast such a taint on DiFalco's capacity for independence as to preclude his participation even as a party-designated appraiser.
NOTES
[1] After 1981, Hartz stopped including its executives in new partnerships. In lieu thereof, executives were given a participation interest in a bonus plan which provided for annual and termination payments to plan participants. Heller is entitled to a substantial payment under the bonus plan, which is also a subject of this suit.
[2] There is no evidence that either party made an effort to negotiate value. Neither party is seeking to compel the other to negotiate. That provision of the agreement has, in effect, been waived.
[3] The relief sought by this motion is "partial" because plaintiff's second amended and supplemental complaint asserts damage claims for alleged breach of the bonus plan, which are not raised on this motion.
[4] The Appraisal Institute is a national organization of real estate appraisers which resulted from the unification of the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers. The Institute has established a Code of Professional Ethics and Uniform Standards of Professional Appraisal Practice.